

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE NOV 2 1 2018

Fairhurst, CJ

CHIEF JUSTICE

This opinion was filed for record

at 8:00 am on Nov 21, 2018

SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| CATHY HARPER, individually, as Personal Representative of the ESTATE OF TRICIA PATRICELLI, as Guardian ad Litem for KHALANI MICHAEL, a minor child, and as Guardian ad Litem for NIYERRAH MICHAEL, a minor child,<br><br>          Respondent,<br><br>v.<br><br>STATE OF WASHINGTON; WASHINGTON DEPARTMENT OF CORRECTIONS, a governmental entity,<br><br>          Petitioner,<br><br>and<br><br>RHONDA FREELAND and JOHN DOE FREELAND and their marital community,<br><br>          Defendants. | NO. 95511-5<br><br>EN BANC<br><br>Filed    NOV 2 1 2018 |

GORDON McCLOUD, J.—Scottye Miller murdered his longtime girlfriend, Tricia Patricelli, 15 days after he was released from prison on Department of Corrections (DOC)-supervised probation. It is undisputed that everyone involved—

Patricelli, Patricelli's family and friends, and DOC—knew that Miller had physically abused Patricelli in the past and would likely do so again if they resumed their relationship.

They did resume that relationship. But Patricelli hid the renewed relationship from her friends, family members, and DOC. In fact, Patricelli explicitly assured DOC that she was not in a relationship with Miller, that she was moving to a place where he could not find her, and that she would call the police if she saw him. Miller's mother also verified in writing that he was sleeping at her home, though it turns out that he was actually living with Patricelli.

The question here is whether DOC is liable for Patricelli's death, despite Patricelli's, Miller's, and his mother's active and successful efforts to prevent DOC from knowing that Miller was in contact with Patricelli. The parties agree that DOC had a duty to supervise Miller while he was on probation and that DOC is not liable unless its supervision constitutes "gross negligence." RCW 9.95.204(4); RCW 72.09.320. But the parties disagree on whether DOC's actions rose to the level of gross negligence.

The trial court dismissed on summary judgment. Clerk's Papers (CP) at 1286-89. The Court of Appeals reversed. *Harper v. Dep't of Corr.*, 2 Wn. App. 2d 80, 92-94, 408 P.3d 735, *review granted*, 190 Wn.2d 1025, 419 P.3d 409 (2018). It ruled that DOC's failure to take additional steps to verify Patricelli's statements or Miller's

housing arrangements could qualify as gross negligence. It also stated that whether a defendant acted with simple or gross negligence is basically a question for the jury, not the court. We reverse the Court of Appeals.

FACTS AND PROCEDURAL BACKGROUND[1]

1. At the time of the murder, DOC was supervising Miller pursuant to two misdemeanor convictions; one of the convictions included an order barring Miller from contacting Patricelli

*A. King County Superior Court, No. 10-1-03032-4 KNT*

Miller had a lengthy criminal history. In 2010, the superior court sentenced Miller to 12 months in jail for a misdemeanor violation of a court order barring him from contacting Patricelli. CP at 80, 980. The superior court suspended that sentence on condition that Miller serve 180 days in jail and submit to 24 months of DOC-supervised probation. CP at 80-81. In addition to probation, the superior court imposed various conditions, ordering Miller to (1) "enter into, make reasonable progress and successfully complete a state certified domestic violence treatment

---

[1] Shortly before oral argument, DOC filed a motion to supplement the record and correct misstatements of fact. Although Cathy Harper (Patricelli's mother) opposed the motion, she did not argue that the supplements or corrections were either not authentic or not relevant. We treat the motion to correct misstatements as an erratum and accept it. We take judicial notice of referenced court documents.

3

program," (2) "commit no criminal offenses," and (3) "comply with the standard rules and regulations of supervision." CP at 81-82.[2]

DOC imposed numerous additional conditions, including that Miller (1) remain within King County, (2) obtain written permission before leaving King County or Washington State, (3) notify DOC before changing residences or employment, (4) abide by written or verbal instructions issued by his community corrections officer, (5) inform DOC of any prescribed medications, (6) not operate a vehicle without a license, (7) not possess or consume alcohol or controlled substances, (8) not frequent places where liquor is sold, (9) submit to breath alcohol concentration and urinalysis testing, (10) complete requested chemical dependency evaluations, (11) complete a mental health evaluation and enter into treatment as directed, (12) not change treatment providers without prior DOC approval, and (13) consent to home visits. CP at 576.

Because the probation period "tolled during any period of confinement," CP at 81, it remained in effect at the time of the murder.

*B. King County Superior Court, No. 12-1-00643-8 KNT*

In 2011, during an argument about Miller's infidelity, Miller pushed Patricelli, punched her in the eye, and threatened to kill her. CP at 1051-52. Miller pleaded

---

[2] The court also originally ordered Miller to "have no contact with[ ] Tricia Patricelli." CP at 81. But it later rescinded that order.

guilty to felony harassment and misdemeanor assault. CP at 84 (felony harassment), 93 (misdemeanor assault).

For the felony harassment, the superior court gave Miller a special drug offender sentencing alternative (DOSA). CP at 88. That DOSA required Miller to undergo residential chemical dependency treatment for 3 to 6 months, followed by 24 months of community custody supervision. *Id.* The superior court memorialized the sentence in a felony judgment and sentence (J&S). CP at 84-89. But that court subsequently revoked Miller's DOSA, resentenced him to 366 days of confinement, and rescinded the terms of community custody. CP at 97-99.

For the misdemeanor assault, the superior court sentenced Miller to 364 days in jail but suspended it all on condition that Miller serve only a few days in jail and submit to 24 months of DOC-supervised probation. CP at 93-95. The superior court ordered the following probation conditions: (1) *"have no contact with*[ ] *Tricia Patricelli per the* [*separate no-contact order*]," (2) "comply with the standard rules and regulations of supervision," (3) "commit no criminal offenses," and (4) "abide by conditions on [the DOSA]." *Id.* (emphasis added). The cross-referenced DOSA conditions were to (1) "not use illegal controlled substances," (2) "not use any alcohol or controlled substances without prescription," (3) "report as directed to a community corrections officer," (4) "[p]ay all court ordered legal financial obligations," and again, (5) *"have no contact with Tricia Patricelli per the separate*

[*no-contact order*]." CP at 88-89 (emphasis added). The superior court memorialized the sentence in a separate misdemeanor J&S under the same cause number as the felony. CP at 93-95. The 2012 conviction's probation period, like the 2010 conviction's probation period, was "tolled during any period of confinement." CP at 93-94.

The separate no-contact order barred Miller from contacting Patricelli for five years, although it gave Miller permission to call and visit with her while he was in custody and enrolled in treatment. CP at 101. As mentioned above, the superior court directly incorporated by reference this no-contact order as a sentence condition in the misdemeanor J&S. CP at 95.

The no-contact order says that Miller (1) "shall not cause, attempt, or threaten to cause bodily injury to, assault, sexually assault, harass, stalk, or keep under surveillance [Tricia Patricelli]," (2) "shall not contact the protected person, directly, indirectly, in person or through others, by phone, mail or electronic means, except for mailing or service of process of court documents through a third party, or contact by the defendant's lawyers," and (3) "shall not knowingly enter, remain, or come within 1000 feet . . . of the [protected person or that] person's residence, school, [or] workplace, . . . [e]xcept the defendant may have telephonic contact with the protected person and may be visited by the protected person while in custody and in treatment after the [b]lack out [p]eriod." CP at 101.

6

In addition to the court-ordered conditions, DOC required Miller to (1) "[w]ork at a DOC approved education, employment, and/or community restitution," (2) "[n]ot possess or consume controlled substances except pursuant to lawfully issued prescriptions," (3) "[p]ay supervision fees as determined by the DOC," (4) "[r]eceive prior approval for living arrangements and residence location," (5) "[n]ot own, use, or possess a firearm or ammunition," (6) "[n]otify [his community custody supervisor] of any change in address or employment," (7) "[u]pon request of the DOC, notify [it] of court-ordered treatment," and (8) "not consume any alcohol." CP at 577.

On October 15, 2012, Miller completed his felony sentence and was released. CP at 1125. Fifteen days later, he killed Patricelli. CP at 575. As outlined above and discussed below, the record shows that during those 15 days, DOC was actively supervising Miller on both the 2010 misdemeanor probation, which had very few conditions, and the 2012 misdemeanor probation, which included a no-contact order.

2. DOC communicated with Patricelli several times prior to Miller's release

Before Miller was released on the balance of his 2010 and 2012 misdemeanor probation terms, Angella Coker, a victim services liaison from DOC, contacted Patricelli four times to inform her of Miller's impending release and to help her develop a safety plan. CP at 138-39. Patricelli assured Coker that she did not intend to resume her relationship with Miller and that she planned to move without informing Miller of her new address. *Id.* Coker also wrote a letter, which Patricelli

7

had requested, confirming Patricelli's status as a domestic violence victim so that she could relocate without a penalty for terminating her lease. CP at 139, 162. Although Coker knew Patricelli planned to move, she did not ask Patricelli for her new address because "people frequently tell [her] they are moving, but do not do so" and because she "did not want to create a record of that new location." CP at 139.

Patricelli did not relocate immediately. On October 17, two days after Miller was released, Patricelli told Coker that she was in the "'process of moving.'" *Id.* Patricelli reassured Coker that there were "'no problems'" and that she was "'prepared to call police if needed.'" *Id.* Coker believed Patricelli, stating that "[i]t was [her] clear impression from [her] communications with Ms. Patricelli that [Patricelli] was not in contact with Mr. Miller and had no intention of resuming contact with him." *Id.* As discussed below, both Patricelli's mother, CP at 208, and Patricelli's best friend, CP at 163-64, also believed this.

### 3. DOC supervised Miller after his release

On October 16, one day after he was released on DOC supervision, Miller reported to Rhonda Freeland, his DOC supervisor. CP at 33. Miller took a urinalysis test, which came back negative for drugs and alcohol. Miller and Freeland made arrangements to enroll Miller in domestic violence treatment. *Id.*

During their first meeting, Miller informed Freeland that "he was homeless and was 'couch surfing' with relatives," *id.*, even though he was released to an

8

Auburn address connected with the Sober Solutions program, CP at 737, 1125. According to Freeland, DOC did not require misdemeanor probationers like Miller to establish an approved residence upon release from prison, CP at 33-34, although he was supposed to obtain prior approval of address changes from DOC, CP at 576. So Freeland told Miller to maintain a weekly shelter log documenting where he stayed each night, with signature verification by someone at each location. *See* CP at 33. Freeland did not discipline Miller for changing addresses without prior approval.

Freeland also called one of the phone numbers she had for Patricelli but received no answer. *Id.* Freeland did not call the other phone number that DOC had listed for her.

On October 17, Freeland verified that Miller had initiated the process for entering domestic violence treatment. *Id.* Freeland also contacted Coker, Patricelli's victim liaison, who informed Freeland that Patricelli had moved to a new residence (though Patricelli was still in the process of moving at that time) and would call the police if Miller contacted her. *Id.*

On October 23, Miller reported to Freeland for his second check-in. *Id.* He again tested negative for drugs and alcohol. *Id.* Miller recounted the steps he had taken during the past week to enroll in domestic violence treatment, including scheduling a psychological assessment. CP at 34. Miller also submitted a completed

9

shelter log showing that he had stayed with his mother each night in Burien. CP at 33, 107-08. Miller's mother signed each entry. CP at 104, 107-08. No one disputes that she signed it.

On October 29, the day before Miller was scheduled to report a third time, Freeland called Miller's mother to verify his living arrangements. CP at 34. Miller's mother confirmed that he "could live" with her in Burien, though she did not specifically verify that he had been living with her already. CP at 34, 104. Freeland then vetted the Burien address through Coker, the victim liaison, who said she had no known concerns about the address at that time. CP at 34.

The next morning, Miller stabbed Patricelli to death in the shower. CP at 659. Her mother, Cathy Harper, was one of the first people to discover the bloody crime scene. CP at 225-27. Miller appears to have murdered Patricelli over accusations that she was seeing someone else. *See* CP at 325. The day before the murder, Miller posted a cryptic message on his Facebook account: "Well I just got got out na it'z tyme tha go bacc to prison fo bout 10 or 15." CP at 1133. Miller's responses to comments from other Facebook users about that message were "I got tha do this" and "um bout tha do sum to were um gon do 10 or 15 but know I luv u." *Id.*[3] Freeland was unaware of those Facebook posts.

---

[3] DOC objected to the admission of this evidence. CP at 1187. But the trial court reviewed it before making its decision, and DOC did not appeal that ruling. CP at 1288-89.

Miller was convicted of murder in the first degree and received an exceptional sentence of 48 years. CP at 800-10.

### 4. Miller and Patricelli renewed their relationship but hid it from others

It turns out that Miller, his mother, and Patricelli herself lied to DOC about Miller's living arrangements while he was on probation. In fact, Patricelli had seen Miller, even though she said she had not. And Miller was not staying with his mother, despite his mother saying, in a signed document, that he was. Miller was actually living with Patricelli. CP at 324.[4] But the only people who knew that fact were Patricelli, her daughters, their roommate, and Miller. CP at 325-26. And all of them were actively hiding the relationship from DOC and others.

Patricelli even hid the relationship from her best friend, Breanna Capener. CP at 164. Patricelli told Capener the same things she told Coker, her DOC victim liaison: "Miller did not know the address of the Auburn apartment and . . . she did not want to see him or for him to know her new address" and "she would call law enforcement if he showed up at her Auburn apartment." *Id.* Like Coker, Capener

---

[4] DOC disputes whether Miller was actually living with Patricelli. For purposes of summary judgment review, we consider "[t]he facts and reasonable inferences from the facts . . . in the light most favorable to the nonmoving party." *Hertog v. City of Seattle*, 138 Wn.2d 265, 275, 979 P.2d 400 (1999) (citing *Taggart v. State*, 118 Wn.2d 195, 199, 822 P.2d 243 (1992)). Here, the nonmoving party is Harper.

believed Patricelli despite Miller and Patricelli's long history of getting back together. *Id.*

Patricelli also hid the fact that she and Miller were living together from her mother, Cathy Harper, even though the two were very close. CP at 208-09. Patricelli kept it secret even when she and her daughters slept over at Harper's house to get away from Miller the night before the murder. CP at 237-38. Like Coker and Capener, Harper believed Patricelli was no longer with Miller and had not seen him while he was on probation. CP at 208-09.

### 5. Harper sued DOC

Harper sued DOC, alleging that DOC was grossly negligent in its supervision of Miller. CP at 11-13.[5] She argues that DOC should have monitored Miller's whereabouts more closely because of his long history of committing domestic violence crimes, breaking no-contact orders, and threatening to kill Patricelli. CP at 2. She notes that DOC was aware of Miller's history of domestic violence against Patricelli, including the death threats he made to her in the past, CP at 1131, and that DOC employees believed Miller would eventually try to contact Patricelli after his release as he had done previously, CP at 1123.

---

[5] Specifically, Harper sued for wrongful death, negligent infliction of emotional distress, and loss of consortium. CP at 11-13. The only issue before us now is whether the trial court erred in dismissing these claims due to lack of proof that DOC was grossly negligent.

12

Specifically, Harper argues that DOC should have (1) imposed GPS (global positioning system) monitoring and geographical restrictions on Miller, (2) required Miller to take a polygraph test, (3) conducted field supervision, such as home visits, (4) monitored Miller's social media accounts, (5) verbally verified with Miller's mother that he was living with her rather than rely solely on her signature, (6) arrested Miller for changing addresses without having first notified DOC, in violation of one of his probation conditions, and (7) not authorized him to live in sober housing in the city (Auburn) to which Patricelli eventually moved (though DOC may not have known that Patricelli moved to Auburn). CP at 265-68, 293.

6. DOC moved for summary judgment

DOC moved for summary judgment, arguing that its actions do not amount to gross negligence. CP at 15-29. The trial court agreed and dismissed Harper's claims. CP at 1286-89. The Court of Appeals reversed, ruling that the evidence was sufficient to withstand summary judgment. *Harper*, 2 Wn. App. 2d at 92-94. In reversing, it said that the jury—not the court—should "almost always" draw the distinction between simple and gross negligence. *Id.* at 91-92. We granted review. *Harper*, 190 Wn.2d 1025.

STANDARD OF REVIEW

We review a trial court's decision to grant summary judgment de novo. *Hertog v. City of Seattle*, 138 Wn.2d 265, 275, 979 P.2d 400 (1999). On review, we

13

consider "facts and reasonable inferences from the facts . . . in the light most favorable to the nonmoving party." *Id.* (citing *Taggart v. State*, 118 Wn.2d 195, 199, 822 P.2d 243 (1992)). We grant summary judgment when "there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Id.* (citing *Taggart*, 118 Wn.2d at 199; CR 56(c)).

## ANALYSIS

Harper alleges that DOC supervised Miller in a grossly negligent manner. If this were a case involving simple negligence, Harper would have to show "the existence of a duty . . . , breach of the duty, and injury to plaintiff proximately caused by the breach." *Id.* (citing *Degel v. Majestic Mobile Manor, Inc.*, 129 Wn.2d 43, 48, 914 P.2d 728 (1996)). But this is a case of gross negligence.[6] Gross negligence most obviously differs from simple negligence in that it requires a greater breach; to prove gross negligence, Harper must show that DOC *"substantially"* breached its

---

[6] The parties seem to agree that Miller was on both probation and community custody. Mot. to Suppl. R. & Correct Misstatements of Fact at 4 n.2; Resp. to Pet'r's Mot. to Suppl. R. & Correct Misstatements of Fact at 2-3. Regardless, Harper must prove DOC acted with gross negligence. RCW 9.95.204(4) (DOC is "not liable for civil damages resulting from any act or omission in the rendering of *superior court misdemeanant probation activities* unless the act or omission constitutes *gross negligence*." (emphasis added)); RCW 72.09.320 (DOC is "not liable for civil damages resulting from any act or omission in the rendering of *community placement activities* unless the act or omission constitutes *gross negligence*." (emphasis added)).

14

duty by failing to act with even slight care. *Nist v. Tudor*, 67 Wn.2d 322, 331, 407 P.2d 798 (1965) (emphasis added).

Before this court, the parties dispute whether DOC breached that duty of slight care. Although breach is generally a question left for the trier of fact, the court may determine the issue as a matter of law "if reasonable minds could not differ." *Hertog*, 138 Wn.2d at 275 (citing *Sherman v. State*, 128 Wn.2d 164, 183, 905 P.2d 355 (1995)).

1. DOC faces potential liability based on the take charge duty, a duty that arose from the 2010 misdemeanor probation and the 2012 misdemeanor probation with a no-contact order

Generally, DOC is not responsible for preventing criminal defendants from harming others absent a special relationship. *Binschus v. Dep't of Corr.*, 186 Wn.2d 573, 578, 380 P.3d 468 (2016) (citing *Petersen v. State*, 100 Wn.2d 421, 426, 671 P.2d 230 (1983)). One such special relationship arises when DOC "'takes charge of a third person whom [it] knows or should know to be likely to cause bodily harm to others if not controlled.'" *Taggart*, 118 Wn.2d at 219 (quoting RESTATEMENT (SECOND) OF TORTS § 319 (AM. LAW INST. 1965)).

In the simple negligence context, we have described this take charge duty as the "duty to take reasonable precautions to protect against reasonably foreseeable dangers posed by the dangerous propensities of [the person supervised]." *Id.* at 217. This means that DOC must determine whether an offender "is likely to cause bodily

15

harm to others if not controlled." *Id.* at 220. DOC makes this determination by considering the offender's "criminal history and progress" during release. *Id.* If DOC determines that an offender is likely to cause bodily harm to others if not controlled, then it "is under a duty to exercise reasonable care to control the [offender] and to prevent him or her from doing such harm." *Id.*

We have recognized a take charge duty under various types of community supervision programs. *See Joyce v. Dep't of Corr.*, 155 Wn.2d 306, 315-16, 119 P.3d 825 (2005) (recognizing a duty of community corrections officers); *Hertog,* 138 Wn.2d at 281, 288-90 (recognizing a duty of city probation counselors and county pretrial release counselors); *Bishop v. Miche*, 137 Wn.2d 518, 531, 973 P.2d 465 (1999) (recognizing a duty of county probation officers).

DOC had a take charge duty to supervise Miller on both the 2010 and 2012 misdemeanor probations—including the 2012 no-contact order. DOC argues that it was not grossly negligent in discharging that duty.

> 2. To survive summary judgment, Harper must present substantial evidence that DOC failed to exercise slight care

We must determine whether a jury could find that DOC's alleged shortcomings rise to the level of gross negligence. In *Nist*, the foundational case on the issue, we expanded on the "frequently expressed statement that gross negligence means the failure to exercise slight care." 67 Wn.2d at 324 (citing *Crowley v. Barto*, 59 Wn.2d 280, 367 P.2d 828 (1962); *Eichner v. Dorsten*, 59 Wn.2d 728, 370 P.2d

16

592 (1962)). In doing so, we described "gross negligence" as "negligence substantially and appreciably greater than ordinary negligence." *Id.* at 331. The failure to exercise slight care, we continued, does not mean "the total absence of care but care substantially or appreciably less than the quantum of care inhering in ordinary negligence." *Id.*

In our description of gross negligence, we set ordinary, or simple, negligence as the baseline for comparison. *Id.* A person acts with simple negligence when he or she exercises less than "that degree of care which the reasonably prudent person would exercise in the same or similar circumstances." *Id.* Thus, a person acts with *gross* negligence when he or she exercises "*substantially or appreciably*" less than that degree of care which the reasonably prudent person would exercise in the same or similar circumstances. *Id.* (emphasis added); *see Swank v. Valley Christian Sch.*, 188 Wn.2d 663, 687, 398 P.3d 1108 (2017) (explaining that the evidence could suggest that defendant "'substantially' failed to meet the standards of a reasonable and prudent person under the circumstances" (citing *Nist*, 67 Wn.2d at 328)).

In *Nist*, we explained how a court should analyze claims of gross negligence on a motion for summary judgment. First, the court should specifically identify the relevant failure alleged by the plaintiff. *See Nist*, 67 Wn.2d at 331. The relevant failure is the action that the plaintiff claims that the defendant should have taken but did not, allegedly causing the plaintiff's injury. Then the court must determine

17

whether the plaintiff presented substantial evidence that the defendant failed to exercise slight care under the circumstances presented, considering both the relevant failure and, if applicable, any relevant actions that the defendant did take. *Id.* at 332.

### A. In Nist, *we instructed courts to specifically identify the relevant failure alleged by the plaintiff*

In *Nist*, two neighbors, Crystal Tudor and Margaret Nist, traveled by car to go bean picking. *Id.* at 323. As Tudor, the driver, prepared to turn left, she slowed down, turned on her blinker, and allowed a following car to pass. *Id.* at 323-24. Moments later, she "abruptly" turned into oncoming traffic and collided with a truck. *Id.* at 324. The collision seriously injured Nist, who then sued Tudor, alleging gross negligence. *Id.* Nist lost at the trial level after the court literally interpreted "the failure to exercise slight care . . . to mean that, if the defendant driver exercised any care at all for the safety of her guest passenger, the passenger could not recover." *Id.* Because Tudor had "slowed her car to a near stop," "waited for a following car to pass," and "gave a left-turn signal," the trial court held that she exercised "sufficient care to negate a finding of gross negligence." *Id.*

Our court reversed. *Id.* at 332-33. We explained that courts, when determining the degree of negligence (i.e., gross or simple) in a particular case, must focus their analysis on "the hazards of the situation confronting the actor." *See id.* at 331. In *Nist*, for example, we noted that the trial court should have focused its analysis on the hazard that caused Nist's injuries—the oncoming truck—rather than on the

18

dangers presented by following cars. *Id.* at 331-32. By slowing down, using a turn signal, and waiting to be passed, Tudor may have responded to the following car as a reasonably prudent person would have. *Id.* at 331. But her response had "little or no relationship to the hazards generated by the approaching truck." *Id.* Since the approaching truck was the relevant hazard, we held that a jury could find that Tudor exercised substantially and appreciably less than that degree of care that the reasonably prudent person would have exercised in the same or similar circumstances. *Id.* at 332.

Following guidance from *Nist*, in ruling on a motion for summary judgment, trial courts must specifically identify the relevant failure alleged by the plaintiff. If the evidence shows that the defendant may have failed to exercise slight care in the specific area that is relevant to the case (e.g., turning into oncoming traffic), then the trial court should not grant summary judgment—even if a defendant exercised great care in other respects (e.g., allowing a car to pass).

We therefore focus on the relevant failure alleged by Harper: DOC failed to prevent Miller from contacting her daughter—despite the 2012 no-contact order and the probation conditions to commit no criminal offenses. If reasonable minds could differ about whether DOC exercised or failed to exercise slight care in supervising the no-contact order and other relevant conditions, then the court *should not* grant summary judgment for DOC—even if DOC exercised great care in supervising other

unrelated conditions, such as testing Miller for drugs and alcohol. Conversely, if reasonable minds could not differ about the fact that DOC did exercise slight care in supervising the no-contact order and other relevant conditions, then the court *should* grant summary judgment for DOC.

In sum, we focus on what DOC did (or failed to do) to make sure that Miller did not contact Patricelli.

> B. *Where, as here, the defendant is relieved of liability unless grossly negligent, a plaintiff must provide substantial evidence of gross negligence to survive summary judgment*

The Court of Appeals correctly observed that in a case like this, a plaintiff must provide "'substantial evidence of seriously negligent acts or omissions on the part of'" the defendant to survive summary judgment. *Harper*, 2 Wn. App. 2d at 90 (quoting *Nist*, 67 Wn.2d at 332). But it then suggested that a plaintiff can survive summary judgment in a gross negligence case by providing *any* evidence of negligence—not just "substantial evidence of seriously negligent acts":

> [T]he sufficiency of evidence of gross negligence is not merely a function of the quantity of evidence presented, it is also a function of the significance the jury could give to that evidence in light of the foreseeable danger. It is in this latter respect that the distinction between ordinary negligence and gross negligence will often be manifest. *But the drawing of such distinction will almost always require the fact-finding judgment of a jury, as opposed to the legal analysis of a court.*

*Id.* at 91-92 (emphasis added).

We disagree. To survive summary judgment in a gross negligence case, a plaintiff must provide substantial evidence of serious negligence. In determining whether the plaintiff has provided substantial evidence, the court must look at all the evidence before it, evidence that includes both what the defendant failed to do *and* what the defendant did. If a review of all the evidence suggests that reasonable minds could differ on whether the defendant may have failed to exercise slight care, then the court must deny the motion for summary judgment. But if a review of all the evidence reveals that the defendant exercised slight care, and reasonable minds could not differ on this point, then the court must grant the motion.

We did not alter this analysis in *Swank*. We just recognized that the standards for simple negligence, gross negligence, and recklessness all involve a "fine-grained factual analysis" that is """"generally not susceptible to summary judgment."""" *Swank*, 188 Wn.2d at 685 (quoting *Owen v. Burlington N. Santa Fe R.R. Co.*, 153 Wn.2d 780, 788, 108 P.3d 1220 (2005) (quoting *Ruff v. County of King*, 125 Wn.2d 697, 703, 887 P.2d 886 (1995))). But we did not say that the decision about whether a negligent act rises to the degree of gross negligence or recklessness should almost always go to the jury. We merely recited a generalized, shorthand statement about the factual nature of negligence and proximate cause, a statement that can be traced back to at least *LaPlante v. State*, a 1975 decision from this court. 85 Wn.2d 154, 531 P.2d 299 (1975). In *LaPlante*, we provided more context:

21

> *While issues of negligence and proximate cause are not generally susceptible to summary adjudication, courts are not precluded from rendering such judgments.* The issues of negligence and proximate cause must be accorded the same treatment as any other following a motion for summary judgment, *i.e.*, if the court determines there is no genuine issue of material fact then it must determine whether the moving party is entitled to a judgment as a matter of law. Further, where the facts are undisputed and do not admit of reasonable differences of opinion, the question of proximate cause is one of law subject to review by this court.

*Id.* at 159-60 (emphasis added) (citations omitted).

In fact, prior to *Harper*, the Court of Appeals dismissed similar cases as a matter of law. *See Whitehall v. King County*, 140 Wn. App. 761, 167 P.3d 1184 (2007); *Kelley v. Dep't of Corr.*, 104 Wn. App. 328, 17 P.3d 1189 (2000). In *Kelley*, a woman sued DOC for gross negligence after she was assaulted by an offender who was on community custody. 104 Wn. App. at 329. The woman alleged that DOC was grossly negligent, in part because it had failed to discover the offender's two prior curfew violations. *Id.* at 335-36. The appellate court held that although DOC may have been negligent, it was not grossly negligent. *Id.* at 338. In doing so, the court properly considered both what DOC did and what it failed to do with regard to the relevant alleged failure. *Id.* at 336 ("If [DOC] had made no attempt to learn the circumstances of the crime, a jury could find gross negligence. Here, [DOC] did investigate the circumstances but failed to verify the actual time of the arrest."); *accord Whitehall*, 140 Wn. App. at 768-70.

Here, the Court of Appeals held that a jury could find that DOC was grossly negligent with regard to the alleged failure, i.e., the failure to supervise the no-contact order. *Harper*, 2 Wn. App. 2d at 93. That court noted that although DOC knew about Miller's history of violating no-contact orders barring him from contacting Patricelli, Freeland still (1) failed to call both of Patricelli's phone numbers, (2) failed to ask Miller's mother to verbally confirm that he had been residing with her, and (3) failed to assume that Miller was lying when he reported that he was living with his mother. *Id.* at 92-93.[7]

But the Court of Appeals focused entirely on what DOC failed to do in supervising the no-contact order. It did not consider what DOC did to prevent Miller from contacting Patricelli. As discussed above, prior to Miller's release, a DOC victim services liaison contacted Patricelli about his impending release and helped her move. DOC supervisor Freeland then called Coker, the DOC liaison, who verified that she was in contact with Patricelli, that Patricelli had relocated to a new address unknown to Miller, that Patricelli had not seen Miller, and that Patricelli intended to call the police if she saw him. Freeland also required Miller to submit a weekly shelter log showing where he stayed each night and required another person

---

[7] Although the Court of Appeals properly considered DOC's supervision of the no-contact order, it also considered DOC's alleged shortcomings in verifying Miller's living arrangements. *Harper*, 2 Wn. App. 2d at 92-93. It considered the alleged shortcomings because had Freeland done more to verify the living arrangements, she may have discovered that Miller was in contact with Patricelli. *Id.*

to verify each entry with a signature. Miller's mother acknowledges that she signed the entries stating that Miller was staying with her each night. Freeland even called Miller's mother to verify the living arrangements (although Freeland did not specifically confirm that Miller had been staying with his mother since his release). Freeland then checked with Coker, who said she had no known concerns about the address of Miller's mother.

As it turns out, Miller, his mother, and Patricelli herself lied to DOC throughout the 15 days that Miller was out on probation. Harper argues that the DOC should have done more to uncover these lies, such as visiting Miller at home or monitoring Miller via GPS. And, as mentioned above, the Court of Appeals notes three areas in which DOC could have done more. *Harper*, 2 Wn. App. 2d at 92-93.

But the legislature requires us to apply a gross negligence standard. Under this standard, Harper failed to provide substantial evidence demonstrating that DOC exercised substantially or appreciably less than that degree of care that a reasonably prudent department would have exercised in the same or similar circumstances. Looking at the whole picture—what DOC failed to do *and* what DOC did with regard to the relevant alleged failure—we agree with the trial court that reasonable minds could not differ about the fact that DOC exercised slight care and was therefore not grossly negligent.

CONCLUSION

We reverse the Court of Appeals and affirm the trial court's order granting summary judgment for DOC. Harper failed to produce sufficient evidence to raise a genuine issue of material fact on the question of gross negligence.

_____

George McCloud, Jr.

WE CONCUR:

Fairhurst, C.J.

Stephens, J.

Johnson, J.

Wiggins, J.

Madsen, J.

González, J.

Owens, J.

Yu, J.