IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| KIMBERLY ROBIN CLEMENT FREEMAN, an adult individual; and TWO DESIGN, LLC, a Washington limited liability company, | ) ) ) ) ) | No. 80541-0-I |
| Respondents, | ) ) | |
| v. | ) ) | |
| SENECA VENTURES, LLC, a Washington limited liability company; METROPOLE CAPITAL GROUP, LLC, a Washington limited liability company; J&M CAPITAL GROUP, LLC, a Washington limited liability company; KURT FISHER and CINDY L. FISHER, a marital community; and BRITTANY SHULMAN and JOHN DOE SHULMAN, a marital community, | ) ) ) ) ) ) ) ) ) ) ) ) | UNPUBLISHED OPINION |
| Appellants. | ) ) ) | |

VERELLEN, J. — Investment materials for two hotel ventures represented that investors could opt out and receive back their invested capital plus a 20 percent return once hotel construction reached a certain milestone. The investment materials failed to disclose the risks from delay and default that prevented the ventures from reaching the milestone, misleading reasonable investors about the ventures' riskiness. Because Kurt Fisher was the control person for the companies selling memberships in the ventures, the court did not err by concluding Fisher was individually liable for a

violation of the state securities statute and by granting summary judgment to investor Robin Freeman.

The court also did not err by concluding Fisher sold unregistered securities and by granting summary judgment to Freeman. Because Fisher raised the registration exemption affirmative defense for the first time on appeal, he waived this defense.

Therefore, we affirm.

FACTS

Kurt Fisher is an experienced property developer, a member of Seneca Ventures, LLC, and the managing member of both J&M Capital Group, LLC, and Metropole Capital Group, LLC, which are themselves related to Seneca. J&M was created to purchase, renovate, and operate a boutique hotel in Seattle's Pioneer Square neighborhood. Fisher sold membership interests in J&M between September 2014 and January 2015. Each membership was priced at $100,000. The offering packet stated initial investors "will get a 20% per annum return on their capital invested" if they withdrew their investment at the end of the "entitlement process."[1] A similar representation was made in the company's operating agreement, stating a "priority return on invested capital of twenty percent (20% per annum) will be distributed . . . at the point that [d]evelopment entitlements are in place."[2]

Metropole was founded in 2015 to purchase, renovate, and operate another boutique hotel in Pioneer Square. Fisher sold memberships in Metropole, also priced

---

[1] Clerk's Papers (CP) at 213-14. Fisher appears to use "entitlement process" to mean the steps required "to get the building ready for construction," including permitting and planning. CP at 130, 337-38.

[2] CP at 242.

at $100,000, from August through November of 2015. The Metropole operating

agreement offered initial investors the opportunity to request a return of their

investment plus 20 percent once it applied for a building permit. Neither the J&M nor

the Metropole offerings were registered as securities with the Department of Financial

Institutions.

Kimberly Robin Freeman is an interior designer and the owner of her own

design firm, Two9 Design. In September of 2014, Freeman received a J&M

investment packet from Fisher, and she invested $100,000 in October. She also

agreed to provide design services on the hotel project in exchange for an interest in

the venture. Two9 Design provided $50,000 in services. Fisher offered Freeman the

Metropole investment in June of 2015. Freeman invested $125,000 in the Metropole

venture in August. Her investment in both ventures totaled $275,000.

By late October of 2016, the J&M venture had not received a building permit or

a construction loan. It received a building permit one month later, but Fisher never

picked it up. J&M and Metropole defaulted on their loans in May of 2017. In July of

2018, Freeman filed suit against Fisher and others, alleging violations of the Securities

Act of Washington (WSSA), chapter 20.21 RCW and common law claims of fraud,

breach of fiduciary duties, and negligent misrepresentation. Both companies entered

receivership in December of 2018. Freeman moved for summary judgment on all

claims, and the court granted her motion, except for the common law fraud claim.[3]

The court entered a principal judgment of $275,000 and awarded interest of

---

[3] The trial court entered a CR 54(b) determination to allow an appeal as a matter of right.

$79,457.53 against all defendants.  It also awarded $35,288.44 in attorney fees and costs.

Fisher appeals.

ANALYSIS

We review a grant of summary judgment de novo, engaging in the same inquiry as the trial court.[4]  A grant of summary judgment will be affirmed when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.[5]  Facts and inferences from the evidence will be viewed in a light most favorable to the nonmoving party.[6]

I.  Securities Act Claims

The legislature enacted the WSSA to protect the public, and courts construe it broadly for that purpose.[7]  Washington courts coordinate interpretation of the WSSA with equivalent federal case law but are not bound by those decisions.[8]

RCW 21.20.010(2) prohibits a person from selling securities by making "any untrue statement of a material fact" or "omit[ting] to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading."  RCW 21.20.430 authorizes a private civil action against any

---

[4] SentinelC3, Inc. v. Hunt, 181 Wn.2d 127, 140, 331 P.3d 40 (2014) (quoting Ellis v. City of Seattle, 142 Wn.2d 450, 458, 13 P.3d 1065 (2000)).

[5] Porter v. Kirkendoll, 194 Wn.2d 194, 200, 449 P.3d 627 (2019) (quoting Harper v. Dep't of Corr., 192 Wn.2d 328, 340, 429 P.3d 1071 (2018)).

[6] Id. (quoting Harper, 192 Wn.2d at 340).

[7] Fed. Home Loan Bank of Seattle v. Credit Suisse Sec. (USA) LLC, 194 Wn.2d 253, 259, 449 P.3d 1019 (2019) (quoting McClellan v. Sundholm, 89 Wn.2d 527, 533, 574 P.2d 371 (1978)).

[8] Id. at 264 (citing Kittilson v. Ford, 93 Wn.2d 223, 227, 608 P.2d 264 (1980)).

person who, with exceptions, sells an unregistered security or who violates RCW 21.20.010(2) when selling a security.[9] A person can also be individually liable if they control a seller who employs such practices.[10] A successful plaintiff can recover the consideration paid for the security plus eight percent interest.[11]

A. Untrue Statements of Material Fact By Omission

Washington courts define "material fact" as "'a fact to which a reasonable [person] would attach importance in determining [their] choice of action in the transaction in question.'"[12] For an omission to be material, "'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'"[13] Unlike its federal equivalent, RCW 20.21.010(2) does not require proof of a plaintiff's reliance on the fact for the omission or misleading statement to be actionable.[14]

In Guarino v. Interactive Objects, Inc., this court concluded an omission was material and violated the WSSA.[15] The founders of a software company each held

---

[9] RCW 21.20.430(1); RCW 21.20.140; RCW 21.20.010(2). RCW 21.20.010(1) and .010(3) prohibit other sales practices not at issue here.

[10] RCW 21.20.430(3).

[11] RCW 21.20.430(1).

[12] Clausing v. DeHart, 83 Wn.2d 70, 73, 515 P.2d 982 (1973) (quoting Shermer v. Baker, 2 Wn. App. 845, 855, 472 P.2d 589 (1970)).

[13] Guarino v. Interactive Objects, Inc., 122 Wn. App. 95, 114, 86 P.3d 1175 (2004) (internal quotation marks omitted) (quoting Basic Inc. v. Levinson, 485 U.S. 224, 231-32, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988)).

[14] Credit Suisse, 194 Wn.2d at 261.

[15] 122 Wn. App. 95, 118, 86 P.3d 1175 (2004).

over one million shares of stock in the company.[16]  After both founders were forced to resign, the board negotiated a buy-back of their shares for 50 cents per share as part of a settlement.[17]  The board explained the company was in poor financial condition and had to buy their shares to successfully negotiate a merger and survive.[18]  It did not reveal that the company was already in merger talks or that it had signed a letter of intent with its prospective buyer.[19]  This court concluded the possibility of the merger was material because it was imminent and would have altered the founders' views of the company's fortunes and related share price.[20]  Because the omission was material and misled the founders about the company's prospects, RCW 21.20.010(2) was violated.

In Livid Holdings Limited v. Salomon Smith Barney, Inc., the Ninth Circuit concluded an investor alleged a viable securities fraud claim under both the WSSA and the equivalent federal law due to omissions in the seller's offering memorandum.[21] The offering memo stated it had been "distributed to potential investors in the [c]ompany's $25 million private equity fundraising" and had not been updated since, so "it does not reflect the fact that the above-mentioned $25 million private equity fund raising has been completed."[22]  The memo omitted that the company had received

---

[16] Id. at 102.

[17] Id. at 104.

[18] Id. at 104-05.

[19] Id. at 105.

[20] Id. at 118.

[21] 416 F.3d 940, 944-47, 951-52 (9th Cir. 2005).

[22] Id. at 945.

only $2 million of the $25 million pledged to it.[23]  The omission materially misled the investor by implying the company had $25 million in cash, "radically alter[ing] the picture of the [company's] overall economic health and viability."[24]

By contrast, in <u>In re Donald J. Trump Casino Securities Litigation-Taj Mahal Litigation</u>, the plaintiff failed to allege a statement was materially misleading as a matter of law.[25]  The defendant casino sold high-yield bonds to finish its construction and open for business.[26]  The casino distributed a prospectus stating it believed it would generate sufficient revenue to cover all of its debts.[27]  After the casino filed for bankruptcy protection, bond purchasers filed a complaint alleging the prospectus was materially misleading.[28]  The court affirmed dismissal of the complaint, concluding the "extensive yet specific cautionary language" prevented the allegedly misleading statement from materially misleading  a reasonable investor.[29]

"The prospectus clearly and precisely cautioned that the bonds represented an exceptionally risky, perhaps even speculative, venture and that the [p]artnership's ability to repay the bonds was uncertain."[30]  The prospectus contained pages of cautionary language, including the specific risk of having insufficient cash flow to make

---

[23] <u>Id.</u> at 944-45.

[24] <u>Id.</u> at 947.

[25] 7 F.3d 357, 368 (3rd Cir. 1993).

[26] <u>Id.</u> at 364-65.

[27] <u>Id.</u> at 365.

[28] <u>Id.</u> at 365.

[29] <u>Id.</u> at 369.

[30] <u>Id.</u> at 373.

a bond interest payment.[31] It warned the unprecedented scale of the project in Atlantic City meant "no assurance can be given that, once opened, the Taj Mahal will be profitable or that it will generate cash flow sufficient to provide for the payment of the debt service."[32] It specifically warned a default prior to opening the casino would prevent bond repayments.[33] And it explained there were risks of delay in opening the casino because it might not receive the many permits and licenses it required.[34] Because the prospectus provided many specific warnings about both the risks and potential obstacles to success, the court concluded the allegedly misleading statement was not material.[35]

Fisher analogizes these circumstances to Raab v. General Physics Corp. where a company's annual report projected "an expected annual growth rate of 10 [percent] to 30 [percent] over the next several years," and the court concluded the statement was not material or misleading.[36] The court recognized the projected growth rate was "plainly by way of loose prediction," "anything but definite," and, to a reasonable investor, "mere expressions of optimism."[37] Because the projection lacked any specificity, it would not have been material to a reasonable investor.[38]

---

[31] Id. at 370.

[32] Id. (quoting the prospectus).

[33] Id.

[34] Id. at 370-71.

[35] Id. at 369.

[36] 4 F.3d 286, 289-90 (4th Cir. 1993).

[37] Id. at 290.

[38] Id. We also note the plaintiffs in Raab alleged fraud on the market, so the total mix of information available included both the optimistic annual report and a

Here, both the J&M and Metropole operating agreements offered the ability to opt out and receive a 20 percent return after the end of the development upside period, which was estimated as 9 to 18 months for each project.[39] None of the investment materials warned of the risks from permitting delays, the risks from financing delays, or the risk of default before beginning construction. And Fisher agrees with the Department of Financial Institution's findings that he failed to disclose pertinent information about the risk neither investment would reach the end of the development upside or have adequate capital for a return:

> [Fisher] did not have any funds reserved to repay the investors[,] . . . failed to disclose that there might be inadequate capital to complete the entitlements[,] . . . failed to disclose the risk that the process for acquiring entitlements could have significant delays and require significant development conditions and restrictions[,] . . . [and] failed to provide an independent inspection report describing the condition of [the J&M or the Metropole].[40]

None of the investment materials provided numerous and specific warnings like those given in Trump. The ability to opt out and receive a return was a conditional promise in the company's operating agreement, unlike the vague and optimistic predictions in

---

contemporaneous press release warning of a slowdown in government contract awards important to the company. Id. at 289.

[39] See CP at 133 (Fisher estimating a 12 to 18 month entitlement period for the J&M venture), at 149-50 (Fisher explaining he calculated the projected rate of return for Metropole the same as J&M), at 213 (J&M offering memo stating, "Our goal is to obtain all of the necessary approvals within the next 9-12 months.").

[40] CP at 305 (Department of Financial Institutions consent agreement findings of fact); CP at 153-54 (Fisher stating he does not dispute the consent agreement's stated facts, save for one not relevant here).

the annual report in Raab.  As in Livid Holdings, these omissions created a misleading impression about the ventures' riskiness and likely success.[41]

Fisher argues the warning provided in the subscription agreements to both projects creates an issue of fact about the materiality of any omission.  The subscription agreement warns "the Units are a speculative investment which involve a high degree of risk of loss by Holder of the investment therein."[42]  It also mentions the possibility of total loss of investment.  Assuming Freeman received both the J&M and Metropole subscription agreements,[43] these broad, general, "high risk" warnings cannot overcome the misleading impression left by numerous specific omissions in the other investment materials.[44]

The J&M and Metropole operating agreements promised Freeman the ability to opt out and earn a 20 percent return on her investment.  Regardless of the potential rate of return, a reasonable investor would value the ability to opt out of an investment

---

[41] Fisher asserts he "discussed the potential for delays in development permitting" with Freeman before she invested in J&M.  Appellant's Br. at 6 (citing CP at 177).  But the general "potential for delays" is different from the specific risk of default from permitting delays or insufficient liquidity.  Further, the written investment materials gave a different impression about risks from the permitting process.  Fisher's statement of qualifications implies permitting would not be a problem because his "relationships" with "Seattle's Department of Planning and Development . . . will prove essential to fast track the approvals needed to rehabilitate the J&M building."  CP at 261.

[42] CP at 343.

[43] We assume the subscription agreements are identical because Fisher discusses them together, and only the Metropole subscription agreement is part of the record on appeal.  It is also unclear whether Freeman actually received the Metropole subscription agreement because the version in the record has not been signed by her.

[44] See Trump, 7 F.3d at 369 (numerous, specific warnings made a misleading statement immaterial).

and receive their investment capital back.[45]  The investment materials' vague, general, "high risk" warnings did not address the specific risks that could prevent an investor from opting out.  Fisher failed to disclose the risks of significant delays in the entitlement process or the risk of default from inadequate capitalization if such delays occurred.  Fisher omitted those risks from the total mix of information available to early-stage investors in J&M and Metropole.  By failing to disclose those risks, a reasonable investor would trust in their ability to opt out of the investments and, if nothing else, have their capital returned.

Like Guarino and Livid Holdings, Fisher's omissions presented a misleading impression about the financial risks that any reasonable investor would weigh when considering the projects.  Such omissions were material.[46]  Because the undisputed facts show material omissions that, to any reasonable investor, created a misleading impression of the projects' viability and risks, the court did not err by granting summary judgment on the WSSA claim under RCW 20.21.010(2).

B. Individual Liability for WSSA Violations

Fisher argues he cannot be individually liable under the WSSA because he was not a statutory "seller" of the securities.  But Fisher can also be individually liable as

---

[45] The parties debate whether the 20 percent rate of return was a material fact and actionable under the WSSA.  Because Fisher's omissions themselves constitute actionable misrepresentations under the WSSA and allow for the same damages, RCW 21.20.430(1), we do not need to decide whether the promised rate of return was a material fact.

[46] Livid Holdings, 416 F.3d 947-48; Guarino, 122 Wn. App. at 114.

the control person for J&M and Metropole, which unquestionably sold the securities, regardless of whether he is a "seller."[47]

An individual can be secondarily liable for WSSA violations as a director under RCW 21.20.430(3) when he "'directly or indirectly control[led] [the] seller.'"[48] It is undisputed Fisher was the manager for both J&M and Metropole. Both limited liability corporations' (LLCs) operating agreements provide the manager with "full and complete authority, power and discretion to manage and control the business, affairs and properties of the" companies.[49] Fisher also wrote or co-wrote the misleading investment materials. Because Fisher was the active manager for both LLCs and directly controlled them, he can be individually liable as a control person under RCW 21.20.430(3).

Fisher asserts he cannot be liable as a matter of law, however, because a control person will not be liable when "he or she did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist."[50] Fisher has the burden of proving this exception applies.[51]

In addition to managing the J&M and Metropole LLCs, Fisher was the lead developer on each venture and responsible for obtaining financing, personally

---

[47] Hines v. Data Line Sys., Inc., 114 Wn.2d 127, 137, 787 P.2d 8 (1990); RCW 21.20.430(3).

[48] Id. at 135, 137 (quoting RCW 21.20.430(3)).

[49] CP at 232, 274.

[50] RCW 21.20.430(3).

[51] Id.

investing capital, overseeing all of the development, coming up with the plans or operations, obtaining permits, and determining the ventures' likely profitability and risks. The misleading omissions involved risks to profitability, permitting, adequate capital reserves, capital management, and other information he either knew or would have known by exercising reasonable care in his role as LLC manager or lead developer. Although Fisher asserts he could not have known the J&M permitting process would take two years, he certainly could have known that permitting delays or problems with obtaining financing could present the risk of default. Because Fisher fails to show the exception applies, he can be individually liable under RCW 21.20.430(3).

### C. Sale of Unregistered Securities

RCW 21.20.140 prohibits the sale of unregistered securities, subject to certain exceptions. The court granted summary judgment for Freeman, concluding Fisher sold unregistered securities.

Fisher contends the J&M and Metropole securities are exempt from registration under either the private offering or federal exemptions. Freeman argues Fisher failed to raise these exemptions before the trial court and cannot do so for the first time on appeal. In his reply brief, Fisher "concedes that this issue was not argued before the trial court" but also asserts "it was raised."[52]

---

[52] Reply Br. at 9.

The record does not support Fisher. Although Fisher's sale of unregistered securities in violation of RCW 21.20.140 was squarely before the trial court,[53] he never briefed or argued the exemption defense.[54] The exemptions are an affirmative defense that must be proven by the party advocating them.[55] Because Fisher failed to raise the registration exemption defense in the trial court, he waived it.[56]

## II. Common Law Claims

In addition to her WSSA claims, the court granted summary judgment for Freeman on her claims for breach of fiduciary duty and negligent misrepresentation. Freeman's investments totaled $275,000. Freeman requested a total of $275,000 in damages for all claims and alleged each common law claim could be the proximate cause of all damages. The court entered a judgment for Freeman, awarding $275,000

---

[53] E.g., CP at 98-99 (discussing failure to register in Freeman's summary judgment motion); Report of Proceedings (RP) (Sept. 6, 2019) at 10 (discussing Fisher's failure to register securities).

[54] CP at 321-34 (Fisher's opposition to summary judgment, not addressing registration requirements); RP (Sept. 6, 2019) at 25-33 (Fisher not addressing registration in oral argument).

[55] State v. Mahmood, 45 Wn. App. 200, 211, 724 P.2d 1021 (1986); see RCW 21.20.540 ("In any proceeding under this chapter, the burden of proving an exemption . . . is upon the person claiming it.").

[56] See King v. Snohomish County, 146 Wn.2d 420, 424, 47 P.3d 563 (2002) ("We have held that a defendant may waive an affirmative defense if either (1) assertion of the defense is inconsistent with defendant's prior behavior or (2) the defendant has been dilatory in asserting the defense.") (citing Lybbert v. Grant County, 141 Wn.2d 29, 39, 1 P.3d 1124 (2000)); cf. RAP 2.5(a) ("The appellate court may refuse to review any claim of error which was not raised in the trial court."); Mut. of Enumclaw Ins. Co. v. Myong Suk Day, 197 Wn. App. 753, 769, 393 P.3d 786 (2017) ("'Failure to raise an issue before the trial court generally precludes a party from raising it on appeal. . . . The reason for this rule is to afford the trial court an opportunity to correct any error, thereby avoiding unnecessary appeals and retrials.'") (quoting Smith v. Shannon, 100 Wn.2d 26, 37, 666 P.2d 351 (1983)).

in principal damages plus interest. Because we uphold the trial court's grant of summary judgment and related damage award for Freeman's claims under the WSSA and review of Freeman's other common law claims will not change the damages awarded, we decline to address Fisher's remaining assignments of error.[57]

III. Attorney Fees

Freeman requests attorney fees from appeal under RAP 18.1. RAP 18.1 allows an award of attorney fees when authorized by law or contract. Because RCW 21.20.430(1) authorizes an award of attorney fees to a party injured by a violation of RCW 21.20.010 or RCW 21.20.140 and Freeman proved both, we grant her request for attorney fees upon compliance with RAP 18.1.

Therefore, we affirm.

_____

WE CONCUR:

_____     _____
Andrus, A.C.J.                Mann, C.J.

---

[57] See C.L. v. State Dep't of Soc. & Health Servs., 200 Wn. App. 189, 198-99, 402 P.3d 346 (2017) ("We may affirm a summary judgment order on any basis supported by the record.") (citing Redding v. Virgina Mason Med. Ctr. 75 Wn. App. 424, 426, 878 P.2d 483 (1994)); see also In re Welfare of A.B., 168 Wn.2d 908, 924-25, 232 P.3d 1104 (2010) (declining to consider an argument because, even if correct, "it can have no impact here, adverse or otherwise").