

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE 11-21-19

_____
for CHIEF JUSTICE



This opinion was
filed for record
at 8 a.m. on Nov 21, 2019

Susan L. Carlson
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| GILDARDO CRISOSTOMO VARGAS, an incapacitated person, by and through WILLIAM DUSSAULT, his Litigation Guardian ad Litem; LUCINA FLORES, an individual; ROSARIO CRISOSTOMO FLORES, an individual; and PATRICIA CRISOSTOMO FLORES, a minor child by and through LUCINA FLORES, her natural mother and default guardian, | NO. 96527-7 |
| Petitioners, | EN BANC |
| v. | |
| INLAND WASHINGTON, LLC, a Washington limited liability company, | Filed    NOV 2 1 2019 |
| Respondent, | |
| and | |
| INLAND GROUP P.S., LLC, a Washington limited liability company, RALPH'S CONCRETE PUMPING, INC., a Washington corporation, and MILES SAND & GRAVEL COMPANY d/b/a CONCRETE NOR'WEST, a Washington corporation, | |
| Defendants. | |

GORDON McCLOUD, J.—Gildardo Crisostomo Vargas was working on a construction project when a concrete-carrying hose whipped around, hit him in the head, and caused a severe traumatic brain injury. Vargas and his family sued the general contractor, the concrete supplier, and the concrete pumper for negligence. The trial court granted summary judgment in favor of the general contractor.

We reverse. General contractors have expansive statutory and common law duties to provide a safe workplace. *See Stute v. P.B.M.C., Inc.*, 114 Wn.2d 454, 788 P.2d 545 (1990); *Kelley v. Howard S. Wright Constr. Co.*, 90 Wn.2d 323, 582 P.2d 500 (1978). Here, genuine issues of material fact remain as to whether the general contractor is directly liable—that is, whether it breached its duties to provide a safe workplace and whether any breach proximately caused Vargas's injury. In addition to this potential direct liability, the general contractor is also potentially vicariously liable for the negligence, if any, of the other entities on the jobsite. We therefore remand for further proceedings consistent with this opinion.

FACTUAL AND PROCEDURAL BACKGROUND

In May 2013, a rubber hose carrying concrete whipped Vargas in the head. It knocked him unconscious and caused a traumatic brain injury. Clerk's Papers (CP) at 1716-17, 1743-45. At the time of the incident, Vargas was helping pour the concrete walls of what would become a parking garage for an apartment building.

2

CP at 1716-17. Vargas was employed by Hilltop Concrete Construction LLC. CP at 2457.

Inland Washington LLC was the general contractor on the construction project. *Id.* Inland Washington subcontracted with Hilltop, Vargas's employer, to install concrete. CP at 1669-93, 2457. Hilltop, in turn, entered into agreements with Ralph's Concrete Pumping Inc. and Miles Sand & Gravel Company (also referred to as Concrete Nor'West). CP at 34-36, 71-72; Verbatim Report of Proceedings (VRP) (Apr. 10, 2015) at 170-71. Under the agreements, Ralph's would provide both a pump truck and a certified pump operator, and Miles would supply the concrete. *Id.*

On the morning of the incident, Anthony Howell, a certified pump operator employed by Ralph's, arrived with a pump truck. CP at 263-65. The truck was equipped with a 47-meter-long adjustable boom, a long mechanical arm that allows the operator to pump concrete over a distance and into hard-to-reach areas. CP at 35-36, 71, 77, 1798, 3074. Upon arrival, Howell checked in with Matt Skoog, Hilltop's foreman, who told Howell "where to set up the pump and showed [him] the walls [they] were pumping that day." CP at 263; *see also* CP at 1716. Matt Skoog claims that Steve Miller, Inland Washington's superintendent, helped make the decision of where to park the pump truck. CP at 418-21, 1291-92. Howell then parked the pump truck, prepared the pump, adjusted the boom, and attached a rubber

3

hose to the end of the boom. CP at 263-64, 1716. The boom extended from the street, where the truck was parked, to a scaffold, where three Hilltop employees, including Vargas, stood ready to guide the pumped concrete into place. CP at 35, 270, 1707, 1716. Around the time that Howell was setting up, Derek Mansur, a truck driver employed by Miles, arrived with the concrete. CP at 265, 752-53.

At this point, the stage was set. Mansur, the concrete company's truck driver, would load the concrete into the pump truck's hopper and make sure the hopper remained sufficiently full throughout the pumping. CP at 68, 272-74; VRP (Oct. 28, 2016) at 347-48. Howell, the pump operator, would use a remote control to pump the concrete mix up the boom and out the hose. CP at 271. Vargas and the other Hilltop employees would guide the concrete into place. CP at 1716. Matt Skoog, Hilltop's foreman, would observe the pour from a distance of about 10 to 20 feet. *Id.*

The pour did not proceed as planned. Not long after Howell turned on the pump, his remote lost signal with the truck, causing the pump to automatically shut down. CP at 271. Howell moved closer to the truck to reestablish connection and turned the pump back on. CP at 274-75. Shortly after restarting, the hose emitted a loud, shotgun-like bang and began to whip around. CP at 279-80, 1716-17. Within seconds, the hose struck Vargas, who had been standing approximately 12 feet from the end of the hose, in the side of the head, knocking off his hard hat and leaving

4

him unconscious. CP at 280, 287-88, 1717. It is unclear why the hose whipped; apparently, either concrete clogged the hose or air somehow entered the system. *Compare* CP at 1716-17 (testimony that the hose was clogged), *with* CP at 282-83 (testimony that air entered the system).

Vargas (through his guardian ad litem), along with his wife and children, sued Inland Washington,[1] Ralph's, and Miles. CP at 1739. The Vargas family could not sue Hilltop, Vargas's direct employer, because Hilltop is immune from liability under Title 51 RCW. CP at 2457. The trial court has stayed proceedings against Ralph's and Miles pending this appeal, which is limited to the family's claims against Inland Washington, the general contractor on the project.[2] The Vargas family claims that Inland Washington is directly liable because it breached its common law duty to provide a safe workplace and violated the Washington Industrial Safety and Health Act of 1973 (WISHA), ch. 49.17 RCW. The Vargas family also claims that Inland Washington is vicariously liable for any negligence of Hilltop, Ralph's, and Miles.

---

[1] The Vargas family also sued Inland Group PS LLC. The Vargas family has alleged that Inland Group is Inland Washington's parent company.

[2] The trial court denied Ralph's motion for summary judgment, and we denied Ralph's motion for discretionary review of that decision. Order, *Vargas v. Ralph's Concrete Pumping, Inc.*, No. 96564-1 (Wash. Mar. 6, 2019).

In February 2015, Inland Washington filed its first motion for summary judgment. CP at 1. It argued that "there is no admissible evidence that [it] violated a specific WISHA safety standard leading to Mr. Vargas' injury" and that it "did not otherwise breach a duty of care." CP at 4. The court denied that motion in part, ruling that Inland Washington "owes non-delegable duties under *Stute*." CP at 1218; *see also* VRP (June 26, 2017) at 475-76. The trial court ruled that the jury is in the best position to determine whether Inland Washington was at all responsible for the injury. VRP (June 26, 2017) at 477-78. The trial court explained that the Vargas family's expert, Rick Gleason, presented sufficient evidence that Inland Washington breached its duty. *Id.* at 476-78. However, the court also ruled that Inland Washington "is not vicariously liable." CP at 1218; *see also* VRP (June 26, 2017) at 475-79. Neither party sought discretionary review of the trial court's ruling.

Two years later, Inland Washington filed its second motion for summary judgment. CP at 1639. (At this point, the case had been reassigned to a different trial judge.) In opposition, the Vargas family asked the court to vacate its previous ruling on vicarious liability and to instead rule that Inland Washington is vicariously liable as a matter of law. CP at 1860, 1864. The court granted Inland Washington's motion and dismissed the general contractor from the case with prejudice. CP at 2509. The court reasoned that it did "not see[] much in the way of substance" as to which nondelegable duty was violated and explained that a general contractor is not

6

"a generalized guarantor of safety across the board." VRP (Mar. 31, 2017) at 93. The court also "confirm[ed]" the previous ruling on vicarious liability, finding "no sea change in the law" that would "warrant going back to . . . revisit [the] earlier ruling" and noting that *Afoa v. Port of Seattle*[3] had not yet finished working its way through the appellate courts. *Id.* at 55, 92. However, the court certified its decision, including its "affirmation of its finding that Inland [Washington] is not vicariously liable," to the Court of Appeals. CP at 2579.

A commissioner of the Court of Appeals granted the Vargas family's motion for discretionary review. Ruling Granting Discr. Review in Part (Ruling), *Vargas v. Inland Wash., LLC*, No. 76717-8-I (Wash. Ct. App. July 21, 2017). The commissioner was particularly concerned that the trial court "reaffirmed its prior ruling that Inland is not vicariously liable for the breaches of WISHA or common law duties by the other defendants." *Id.* at 9. The commissioner explained that "there is a substantial ground for difference of opinion" "as to the scope of Inland's WISHA and common law duties and liability as the general contractor" and determined that "immediate review may materially advance the ultimate termination of the litigation." *Id.* at 9-10 (referencing RAP 2.3(b)(4)).

---

[3] *Afoa v. Port of Seattle*, 191 Wn.2d 110, 421 P.3d 903 (2018) (*Afoa* II).

A year later, before the Court of Appeals heard oral argument, this court

issued its decision in *Afoa* II. The Court of Appeals then dismissed review of the

*Vargas* case with the following unpublished order:

> In light of the Supreme Court's decision in [*Afoa* II], which reversed
> this court's decision in *Afoa v. Port of Seattle*, 198 Wn. App. 206, 393
> P.3d 802 (2017), the standards for discretionary review set forth in RAP
> 2.3(b)(4) are not met. Accordingly, we deem review improvidently
> granted.
>
> This matter is remanded to the superior court for further
> proceedings, as if review had never been granted by this court in the
> first instance.

*Vargas v. Inland Wash., LLC*, No. 76717-8-I (Wash. Ct. App. Sept. 17, 2018)

(unpublished), https://www.courts.wa.gov/opinions/pdf/767178.pdf.

The Vargas family sought discretionary review in our court. After we granted

review, Inland Washington asked us to clarify the scope of review, arguing that "the

Court of Appeals[ ] ruling dismissing review is the sole issue before it." Mot. to

Clarify Scope of Review at 3. We rejected Inland Washington's attempt to narrow

the issues, clarifying that we "granted review of both the Court of Appeals decision

that review was improvidently granted and the issues regarding the underlying

merits of the case as raised in the motion for discretionary review filed at the

Supreme Court by the Petitioners." Order Clarifying Scope of Review at 1.[4]

---

[4] The following groups filed amicus briefs: the Building Industry Association of
Washington, the Washington State Labor Council, the Department of Labor and Industries,

STANDARD OF REVIEW

"We review summary judgment motions de novo, engaging in the same inquiry as the trial court." *Afoa v. Port of Seattle*, 176 Wn.2d 460, 466, 478, 296 P.3d 800 (2013) (*Afoa* I) (citing *City of Sequim v. Malkasian*, 157 Wn.2d 251, 261, 138 P.3d 943 (2006)). When reviewing summary judgment motions, we "consider all disputed facts in the light most favorable to the nonmoving party." *Id.* (citing *Dowler v. Clover Park Sch. Dist. No. 400*, 172 Wn.2d 471, 484, 258 P.3d 676 (2011)). The nonmoving party in this case is the Vargas family. "Summary judgment is appropriate if there are no genuine issues of material fact and . . . reasonable minds could reach but one conclusion." *Id.* (citing *Malkasian*, 157 Wn.2d at 261; *Dowler*, 172 Wn.2d at 484); *see also* CR 56(c).

ANALYSIS

At the outset, we must deal with a procedural issue. After initially granting the Vargas family's motion for discretionary review, the Court of Appeals dismissed this case as improvidently granted in light of *Afoa* II. *Vargas*, No. 76717-8-I, slip op. at 1-2. We determined that the standards for discretionary review in our court were met and granted review. Order, No. 96527-7 (Wash. Mar. 6, 2019); *see* RAP 13.5(b) (standards for discretionary review in our court). Inland Washington now

---

the Pacific Northwest Regional Council of Carpenters, and the Washington State Association for Justice Foundation.

9

asks us to dismiss this case as improvidently granted. Suppl. Br. of Resp't at 4. We reject this request.

Inland Washington first argues that the issue of direct liability is not properly before us. *Id.* It claims that the Vargas family failed to preserve the argument in its notice of discretionary review. *Id.* It also claims that the appellate court did not accept review of the issue. *Id.* Both claims are incorrect. In its notice of discretionary review, the Vargas family explicitly noted that it was appealing the trial court's 2017 ruling, CP at 2576-77, in which the trial court dismissed all claims against Inland Washington—including claims of direct liability, VRP (Mar. 31, 2017) at 93. The commissioner of the Court of Appeals then granted discretionary review of the 2017 ruling without limitation. Ruling, No. 76717-8-I, at 12. The direct liability issue is properly before us.

Inland Washington next argues that the issue of vicarious liability is not properly before us. Suppl. Br. of Resp't at 3-4. Inland Washington claims that the Vargas family failed to timely appeal that issue, which the trial court first addressed back in 2015. *Id.* But 2017, not 2015, is the relevant date. In 2017, the trial court considered and then "confirm[ed]" the 2015 ruling, VRP (Mar. 31, 2017) at 55, 92, and certified its "affirmation" to the appellate court shortly thereafter, CP at 2579. The trial court reasoned that it would "rather only do this trial once" and that "if [it is] wrong, [it would] rather be told beforehand rather than two years after the fact."

VRP (Apr. 5, 2017) at 128-29; *see also id.* at 135-36 (reasoning that a single trial is "in everybody's best interest"). The trial court understood that it could have revisited the 2015 decision if it thought it was incorrect under the current state of the law. VRP (Mar. 31, 2017) at 92-93. Inland Washington does not argue that the Vargas family's notice of discretionary review of the 2017 ruling is untimely. The vicarious liability issue is properly before us, too.

As to the merits of this case, Inland Washington is potentially *directly* liable under two theories. First, a general contractor has a common law duty to maintain a safe workplace. *Kelley*, 90 Wn.2d at 332. Second, a general contractor has a statutory duty to comply with WISHA. *Stute*, 114 Wn.2d at 457-58 (citing RCW 49.17.060). Breach of either of these two duties may lead to direct liability.

Inland Washington is potentially *vicariously* liable under two theories, too. First, a general contractor may not delegate its statutory duty to comply with WISHA; if it delegates anyway, it will be "vicariously liable for the negligence of the entity subject to its delegation." *Afoa II*, 191 Wn.2d at 124. Second, a general contractor will be vicariously liable for the negligence of any entity over which it exercises control. *Id.* at 122-24; *Millican v. N.A. Degerstrom, Inc.*, 177 Wn. App. 881, 893, 313 P.3d 1215 (2013).

I. Direct Liability

Genuine issues of material fact exist as to whether Inland Washington is directly liable—that is, whether it breached either its common law or statutory duty to maintain a safe workplace. To prove negligence, the Vargas family must show "'the existence of a duty . . . , breach of the duty, and injury to plaintiff proximately caused by the breach.'" *Harper v. Dep't of Corr.*, 192 Wn.2d 328, 340, 429 P.3d 1071 (2018) (alteration in original) (quoting *Hertog v. City of Seattle*, 138 Wn.2d 265, 275, 979 P.2d 400 (1999)). "Existence of a duty is a question of law." *Hertog*, 138 Wn.2d at 275 (citing *Schooley v. Pinch's Deli Mkt., Inc.*, 134 Wn.2d 468, 474, 951 P.2d 749 (1998)). Breach and proximate cause are generally issues for the trier of fact, but the court may resolve them as a matter of law "if reasonable minds could not differ." *Id.* (citing *Sherman v. State*, 128 Wn.2d 164, 183, 905 P.2d 355 (1995)).

At issue are two duties owed by general contractors to the employees of subcontractors. Under the common law, a general contractor owes a duty to all employees on a jobsite to provide a safe place to work in all areas under its supervision. *Kelley*, 90 Wn.2d at 332. A general contractor also owes a duty to all employees to "'comply with the rules, regulations, and orders promulgated under [WISHA].'" *Stute*, 114 Wn.2d at 457-58 (quoting RCW 49.17.060(2)). If a general contractor breaches one of these two duties, then it may be directly liable. 16 DAVID K. DEWOLF & KELLER W. ALLEN, WASHINGTON PRACTICE: TORT LAW AND

12

PRACTICE § 4:1, at 178-79 (4th ed. 2013) (explaining that "direct liability" "is liability for breach of one's own duty of care"). Because genuine issues of material fact exist as to whether Inland Washington breached these two duties and whether any breach proximately caused the injury, summary judgment is inappropriate.

A. Common Law

"The general rule at common law is that one who engages an independent contractor . . . is not liable for injuries to employees of the independent contractor resulting from their work." *Kelley*, 90 Wn.2d at 330 (citing *Fenimore v. Donald M. Drake Constr. Co.*, 87 Wn.2d 85, 549 P.2d 483 (1976); *Larson v. Am. Bridge Co. of N.Y.*, 40 Wash. 224, 82 P. 294 (1905)). But when a general contractor engages a subcontractor and "retains control over some part of the work," the general contractor "has a duty, within the scope of that control, to provide a safe place of work." *Id.* (citing *Fenimore*, 87 Wn.2d 85). "The test of control is not the actual interference with the work of the subcontractor, but the right to exercise such control." *Id.* at 330-31 (citing *Fardig v. Reynolds*, 55 Wn.2d 540, 348 P.2d 661 (1960)). A general contractor's "general supervisory functions are sufficient to establish control." *Id.* at 331.

*Kelley* illustrates the exception to the general rule. In that case, Edward Kelley, an employee of a subcontractor, fell nearly 30 feet while working on a construction project, suffering severe injuries. *Id.* at 326-27. Kelley sued Wright

13

Construction Company, the general contractor on the project, alleging that "Wright was negligent in not providing a safety net." *Id.* at 327. Despite the general common law rule of nonliability for general contractors, this court explained that Wright exercised sufficient control over the work to be found directly liable:

> Respondent maintains, and we agree, that Wright's general supervisory functions are sufficient to establish control over the work conditions of [the subcontractor]'s employee Kelley. Wright had the right to require use of safety precautions such as lines or nets, or to halt dangerous work in adverse weather conditions. This authority alone was sufficient to establish [the general contractor]'s duty to see that proper safety precautions were taken.

*Id.* at 331. The court further explained that the area in which Kelley was injured was clearly under Wright's supervision, as four different contractors, all of whom were under Wright's control, had recently worked in that area. *Id.* at 332. Thus, the rule from *Kelley* is that a general contractor owes a common law duty to all employees, including employees of subcontractors, to provide a safe place to work in all areas under its supervision. *Id.*

In reaching this conclusion, this court found persuasive the following reasoning from the Michigan Supreme Court:

> "Placing ultimate responsibility on the general contractor for job safety in common work areas will, from a practical, economic standpoint, render it more likely that the various subcontractors being supervised by the general contractor will implement or that the general contractor himself implement the necessary precautions and provide the necessary safety equipment in those areas.
>
> ". . . .

14

> "We regard it to be part of the business of a general contractor to assure that reasonable steps within its supervisory and coordinating authority are taken to guard against readily observable, avoidable dangers in common work areas which create a high degree of risk to a significant number of workmen."

*Id.* at 331-32 (quoting *Funk v. Gen. Motors Corp.*, 392 Mich. 91, 104, 220 N.W.2d 641 (1974), *overruled in part on other grounds as recognized by Stute*, 114 Wn.2d at 462).

Inland Washington grabs on to the "common work areas" language from *Funk*, the Michigan Supreme Court case quoted in *Kelley*, and argues that the general contractor's duty does not extend to "non-common work areas." Suppl. Br. of Resp't at 8. Inland Washington defines "non-common work areas" as areas in which "an expert in a specific job is in charge," "no other subcontractors are engaged in different work," and the general contractor is not present. *Id.*

But this argument mischaracterizes *Kelley*. The court in *Kelley* referenced "common work areas" only when discussing and quoting *Funk*. *Kelley*, 90 Wn.2d at 331-32. It did not attempt to define the phrase at all, let alone in the narrow fashion advocated by Inland Washington. Instead, the court broadly held that the general contractor's "general supervisory functions [were] sufficient to establish control." *Id.* at 331. If a general contractor has the authority to supervise a given area, then it must ensure that the area is safe. *Id.* at 332. This is true regardless of whether an expert other than the general contractor happens to be in charge of a specific job in

15

the area. It is true regardless of whether multiple subcontractors happen to be working in the area at the same time. The court in *Kelley* noted that four different contractors had *recently* worked in the area of the incident, not that they were all present *at the time of* the incident. *Id.* In any event, the court referenced these four contractors only to emphasize that the general contractor had general supervisory functions. *Id.* Finally, a general contractor with supervisory authority over an area must ensure that the area is safe regardless of whether the general contractor is present—a general contractor cannot shirk its duties merely by vacating the premises.

Inland Washington essentially asks us to redefine *Kelley* out of existence (or at least to limit it severely). It notes that "since the early 1980s an overwhelming majority of state high courts have held that employers are not liable to subcontractors' employees" for a variety of policy reasons. Suppl. Br. of Resp't at 8-9. Assuming that is true, we are clearly not part of that majority, as *Kelley* itself demonstrates. We therefore reject Inland Washington's cramped reading of *Kelley* and instead reiterate that a general contractor owes a common law duty to all employees, including employees of subcontractors, to provide a safe place to work in all areas under its control and supervision.

Inland Washington failed to prove as a matter of law that it had no common law duty to provide a safe workplace here. Considering these facts in the light most

16

favorable to the Vargas family, Inland Washington supervised the jobsite and had a right to exercise control over the work of the various entities on the jobsite. *Kelley*, 90 Wn.2d at 330-31. Inland Washington hired Hilltop to install concrete. CP at 1669-93, 2457. Inland Washington's superintendent, Miller, explained that he was responsible for coordinating the job, "'play[ing] babysitter when somebody cries, [and] solv[ing] problems that arise.'" CP at 423. Gordon Skoog of Hilltop explained that Miller answers questions about the plans, "organizes the job site," ensures everything is "all done right," and "just manages the job site." CP at 361. And Matt Skoog, Hilltop's foreman, claims that Miller helped make the decision of where to park the pump truck on the day of the incident. CP at 1291-92.

As to the other elements of this negligence action—breach and causation— genuine issues of material fact remain. Rick Gleason, a certified safety professional and the Vargas family's expert, states that Inland Washington "should have identified in their site safety plan the hazards of concrete pumping" and made "sure there was an overall culture of safety that was developed for the entire site." CP at 2354-55; *see also* CP at 2369-71. Although the general contractor "cannot be everywhere on site at all times," Gleason argues that a good safety plan "identifies hazards prior to the star[t] of work." CP at 2164. Miller, Inland Washington's own supervisor, testified that he was unaware of any site-specific plans or training that addressed the risks of concrete pours. CP at 427-28.

17

As the trial court explained on the first motion for summary judgment, the jury is in the best position to evaluate Inland Washington's conduct and to determine whether it agrees with Gleason's position. VRP (June 26, 2017) at 477-78. Viewing the facts in the light most favorable to the Vargas family, a reasonable juror could evaluate the evidence and determine that Inland Washington failed to provide a safe workplace. This is particularly true given all the genuine issues of material fact that remain pending before the trial court (and that are not at issue here) related to the potential negligence of Ralph's and Miles. If a jury finds that Ralph's, Miles, or both were negligent, which at this point remains a possibility, then it could be more difficult for Inland Washington to successfully argue that it maintained a safe workplace.

Because genuine issues of material fact remain, we reverse the trial court's grant of summary judgment against the Vargas family on this issue. Inland Washington could be directly liable for breaching its common law duty to maintain a safe workplace.

### B. WISHA

In addition to its common law duty to provide a safe workplace, a general contractor may also have a statutory duty to provide a safe place to work. *Stute*, 114 Wn.2d at 463-64. In *Stute*, we recognized that WISHA creates such a duty. *Id.* at 457-58, 460. In that case, Andre Stute, an employee of a subcontractor, fell three

18

stories while working on a construction project, suffering severe injuries. *Id.* at 456. Stute sued P.B.M.C. Inc., the general contractor on the project, "alleging it owed him a duty to provide necessary safety devices at the jobsite." *Id.* We agreed, holding that a general contractor owes a "specific duty" to "all employees working on the premises," *id.* at 457 (citing *Adkins v. Alum. Co. of Am.*, 110 Wn.2d 128, 153, 750 P.2d 1257, 756 P.2d 142 (1988)), to "'comply with the rules, regulations, and orders promulgated under [WISHA],'" *id.* (quoting RCW 49.17.060(2)).[5]

A general contractor *always* owes this duty under WISHA—no analysis of whether the general contractor retained control is necessary. As the court in *Stute* explained, a general contractor has "innate supervisory authority" and therefore also has "per se control over the workplace." *Id.* at 464; *see also id.* at 462 ("Since as a practical matter, the general contractor must have control over the property and working conditions, the general contractor will have the duty to provide for safety."). This per se control "justifie[s]" the "expansive liability" that a general contractor faces. *Kamla v. Space Needle Corp.*, 147 Wn.2d 114, 122, 52 P.3d 472 (2002). Our precedent therefore places "prime responsibility for safety of all workers . . . on the

---

[5] Under WISHA, a general contractor also owes a "general duty" to protect its "own employees from recognized hazards not covered by specific safety regulations." *Stute*, 114 Wn.2d at 457 (citing RCW 49.17.060(1)). This general duty, unlike the specific duty to comply with WISHA, does not extend to all employees working on the premises—just to a general contractor's own employees. Because Vargas was employed by Hilltop, Inland Washington did not owe him a general duty under WISHA.

general contractor," *Stute*, 114 Wn.2d at 463, because "the general contractor is in the best position to coordinate work or provide expensive safety features to protect employees of subcontractors," *id.* at 462 (citing *Alber v. Owens*, 66 Cal. 2d 790, 427 P.2d 781, 59 Cal. Rptr. 117 (1967)).

Several amici have expressed concern that this court in *Afoa* II unsettled this rule of per se control. In that case, this court stated that "[a] jobsite owner *or general contractor* will have this duty only if it maintains a sufficient degree of control over the work." *Afoa* II, 191 Wn.2d at 121 (emphasis added) (citing *Kamla*, 147 Wn.2d at 123). That case involved a jobsite owner, not a general contractor. *Id.* at 115. We therefore had no reason to discuss *Stute*—and in fact, did not discuss *Stute*, much less overrule it. Indeed, even Inland Washington states that "*Afoa* II plainly does not overrule any prior decisions establishing the duty of a general contractor," including *Stute* and *Kelley*. Suppl. Br. of Resp't at 5 & n.2 (boldface omitted). *Stute* remains good law: a general contractor has per se control over the workplace for purposes of WISHA compliance.

As with the common law duty, genuine issues of material fact remain about whether Inland Washington breached its duty to comply with WISHA and whether this breach was a proximate cause of the injury. WISHA regulations require "management to establish, supervise, and enforce"

(a) A safe and healthful working environment.

(b) An accident prevention program as required by these standards.

(c) Training programs to improve the skill and competency of all employees in the field of occupational safety and health.

WAC 296-155-100(1). The accident prevention program must be "tailored to the needs of the particular . . . operation" and include "[a]n on-the-job review of the practices necessary to perform the initial job assignments in a safe manner." WAC 296-155-110(2), (3)(g). For many of the same reasons described in the preceding section, Gleason, the Vargas family's expert, claims that Inland Washington violated these regulations. CP at 2163-64.

In defense, Inland Washington notes that the Department of Labor and Industries inspected the incident and found that Inland Washington committed no WISHA violations. CP at 99-112, 1722. But as the Department of Labor and Industries explains in its amicus brief, "facts may develop throughout tort litigation that support the existence of a WISHA violation" that the department was unable to uncover during its "relatively short" six-month investigation period. Br. of Amicus Curiae Dep't of Labor & Indus. At 5 n.4.

We reverse the trial court's grant of summary judgment against the Vargas family on this direct liability issue, too. Inland Washington is potentially directly liable for breaching its statutory duty to comply with WISHA. As the trial court explained on the first motion for summary judgment, the jury should evaluate Inland

Washington's conduct to determine whether it was at all responsible for the injury. VRP (June 26, 2017) at 477-78.

## II. Vicarious Liability

In addition to its potential direct liability, Inland Washington is potentially vicariously liable, based on two separate theories, for the failure of others on the jobsite to provide a safe workplace. First, a general contractor that delegates its statutory duty to comply with WISHA is "vicariously liable for the negligence of the entity subject to its delegation." *Afoa* II, 191 Wn.2d at 124. Second, a general contractor is vicariously liable for the negligence of any entity over which it exercises control. *Id.* at 122-24; *Millican*, 177 Wn. App. at 893.

### A. Delegation

We have referred to a general contractor's common law and statutory duties as "nondelegable." *Afoa* II, 191 Wn.2d at 121 (citing *Kelley*, 90 Wn.2d at 334); *Kamla*, 147 Wn.2d at 122. A "nondelegable duty" is "[a] duty for which the principal retains primary (as opposed to vicarious) responsibility for due performance even if the principal has delegated performance to an independent contractor." BLACK'S LAW DICTIONARY 638 (11th ed. 2019). Although *Black's Law Dictionary* refers to this responsibility as primary rather than vicarious, Washington courts have explained that "a nondelegable duty may result in vicarious liability." *Afoa* II, 191 Wn.2d at 123; *see also Millican*, 177 Wn. App. at 890-91. "An entity

22

that delegates its nondelegable duty will be vicariously liable for the negligence of the entity subject to its delegation." *Afoa* II, 191 Wn.2d at 124; *see also Millican*, 177 Wn. App. at 896-97. Regardless of whether we label this form of liability as direct or vicarious, if a general contractor delegates its own duties to a subcontractor, the general contractor will be liable for the subcontractor's breach of that delegated duty.

As discussed above, genuine issues of material fact remain as to whether Inland Washington breached its common law and statutory duties. To the extent Inland Washington claims that it delegated its duties to Hilltop, Ralph's, or Miles, it faces potential liability for any breach of those delegated duties found by the fact finder below.

### B. Control

A general contractor may also face another form of vicarious liability: for another entity's negligence. We have held that entities other than general contractors, such as subcontractors and jobsite owners, may owe the same workplace-safety duties as general contractors. *Afoa* I, 176 Wn.2d at 473; *Gilbert H. Moen Co. v. Island Steel Erectors, Inc.*, 128 Wn.2d 745, 756-58, 912 P.2d 472 (1996). In *Moen*, for example, we explained that "nothing in the relevant statutes, regulations or *Stute* indicates the subcontractor is relieved of its duty to comply with safety regulations and provide a safe workplace." 128 Wn.2d at 757. "The

subcontractor, despite the general contractor's workplace safety duty, retains concurrent responsibility to meet workplace safety standards in the areas under its control." *Id.* Thus, multiple entities—jobsite owners, general contractors, subcontractors—may concurrently owe independent yet overlapping duties to maintain a safe workplace. And one entity, such as a general contractor, may be vicariously liable for another entity's, such as a subcontractor's, negligence. This is distinguishable from the version of vicarious liability, discussed above, that arises when a general contractor delegates *its own* nondelegable duty.

In *Afoa* II, this court described the circumstances in which a jobsite owner (not a general contractor) may be vicariously liable for another entity's breach of its independent duty to provide a safe workplace. Afoa, who was severely injured while working for a cargo company at the Port of Seattle, sued the port, alleging that it "retained control over [his employer] and was responsible for his injuries because the Port violated its nondelegable duties under [WISHA] and the common law." *Afoa* II, 191 Wn.2d at 117. The port defended by arguing that four airlines, which were not party to the suit, shared fault. *Id.* The jury found that the port retained sufficient control over Afoa's employer to give "rise to a duty of care to Afoa," and that the port breached that duty. *Id.* at 117-18. But the jury found that the four airlines were at fault, too. *Id.* at 118. And since the airlines were not party to the

suit, Afoa could not recover the approximately $30 million in damages apportioned to them. *Id.*

On appeal, "[t]he Court of Appeals held that the Port had a nondelegable duty and was therefore vicariously liable for the airlines' fault." *Id.* This court reversed, holding that an entity is not automatically vicariously liable simply because it breaches its own nondelegable duty. *Id.* at 122-24. The port might be vicariously liable for an airline's breach of its own concurrent duties, but only "if the jury makes the necessary finding of control." *Id.* at 124. Although the jury found that the port retained control over Afoa's employer, it was not asked to determine whether the port retained control over the airlines, too. *Id.*

In light of *Afoa* II, the question here is whether a genuine issue of material fact exists as to whether Inland Washington exercised sufficient control over Hilltop, Ralph's, and Miles to face vicarious liability. The court in *Afoa* II explained that "control exists where 'there is a retention of the right to direct the manner in which the work is performed.'" *Id.* at 126 (quoting *Kamla*, 147 Wn.2d at 121). But both *Afoa* II and *Kamla*, on which *Afoa* II relies, involved jobsite owners, not general contractors. *Id.* at 117; *Kamla*, 147 Wn.2d at 118. And we have always treated jobsite owners differently than general contractors. *E.g.*, *Kamla*, 147 Wn.2d at 120-25 (reaffirming *Kelley* and *Stute* but distinguishing jobsite owners from general contractors); *Afoa* I, 176 Wn.2d at 472 (same).

25

In the context of general contractors, the control analysis is different. We have explained that "[t]he test of control is not the actual interference with the work of the subcontractor, but the right to exercise such control." *Kelley*, 90 Wn.2d at 330-31 (citing *Fardig*, 55 Wn.2d 540). In *Kelley*, we held that the general contractor's "general supervisory functions [were] sufficient to establish control." *Id.* at 331. As discussed above, considering the facts of this case in the light most favorable to the Vargas family, Inland Washington supervised the jobsite and had a right to exercise control over the work of the various entities on the jobsite. Inland Washington is thus potentially vicariously liable for the negligence, if any, of those other entities. Of course, a general contractor who retains a right to exercise control will not be vicariously liable unless the plaintiff proves that some entity on the jobsite was negligent. But if the plaintiff can do that, then the general contractor will be vicariously liable for that negligence. *See* BLACK'S, *supra*, at 1099 (defining "vicarious liability" as "[l]iability that a supervisory party . . . bears for the actionable conduct of a subordinate . . .").

Inland Washington, along with amicus Building Industry Association of Washington, claims that this understanding of control effectively subjects general contractors to strict liability. Suppl. Br. of Resp't at 16; Br. of Amicus Curiae Bldg. Indus. Ass'n of Wash. at 15-19. Inland Washington claims that this would make general contractors "insurers of every worker on a project," and this "sort of liability

... could ... wip[e] out construction across Washington." Suppl. Br. of Resp't at 16-17. Inland Washington argues that general contractors will be forced "to extract specific contractual concessions from independent contractors in the form of an indemnity and waiver of immunity." *Id.* at 17 (citing RCW 4.24.115). Such contractual concessions, according to Inland Washington, would "undermine[]" the "compromise" of workers' compensation because "the supposedly immune employer [here, the subcontractor Hilltop] would be saddled with a double loss: payment of L&I premiums to the State, and payment of indemnity to the general contractor." *Id.*

All of Inland Washington's arguments fall short. First, "vicarious liability for the negligence of a contractor is not strict liability." *Knutson v. Macy's W. Stores, Inc.*, 1 Wn. App. 2d 543, 547, 406 P.3d 683 (2017). "[V]icarious liability is liability for the breach of someone else's duty of care." 16 DEWOLF & ALLEN, *supra*, § 4:1; *see also* BLACK'S, *supra*, at 1099. Here, Inland Washington will be vicariously liable only if the Vargas family proves that one of the other entities on the jobsite was negligent. Strict liability, on the other hand, "does not depend on proof of negligence or intent to do harm." BLACK'S, *supra*, at 1099.[6]

---

[6] The Vargas family notes that strict liability may be appropriate under *Floeting v. Group Health Cooperative*, 192 Wn.2d 848, 434 P.3d 39 (2019), a case involving the Washington Law Against Discrimination, ch. 49.60 RCW. Resp. of Appellants Vargas to Br. of Amicus Curiae Bldg. Indus. Ass'n of Wash. at 8-12. But in *Floeting*, we made clear that our analysis of liability was informed by the statute at issue. 192 Wn.2d at 856-57.

Second, Inland Washington's argument conflicts with this court's precedent. In *Moen*, this court endorsed the contractual concessions that Inland Washington claims would undermine workers' compensation. In that case, Moen, a general contractor, subcontracted with Island Steel Erectors. *Moen*, 128 Wn.2d at 748. In an addendum to the subcontract, the subcontractor waived its immunity and agreed to indemnify the general contractor to the extent of its own negligence. *Id.* at 748-49. After an on-the-job injury, an employee of the subcontractor sued the general contractor for negligence but "could not sue [the subcontractor] because of its employer immunity." *Id.* at 749-50 (citing RCW 51.04.010). After the general contractor settled with the employee, it sued the subcontractor for indemnity pursuant to the addendum. *Id.* at 751. We held that the indemnity provision in the addendum was valid, explaining that a subcontractor can agree to indemnify a general contractor to the extent of the subcontractor's negligence. *Id.* at 752-55; *see also* RCW 4.24.115(1)(b). We explained that if such provisions were invalid,

> a general contractor's exposure for injuries to the employees of a subcontractor would be increased substantially. The general contractor would be fully liable for the losses suffered by an employee of a subcontractor injured at a construction site under the nondelegable duty of *Kelley*. Given its employer immunity under RCW Title 51, a subcontractor could never be sued by its employee. . . . If a general contractor could no longer shift liability to a subcontractor using an

---

Here, for the reasons discussed above, Inland Washington is potentially vicariously liable for the negligence of other entities on the jobsite. Because this liability depends on an underlying finding of negligence, Inland Washington does not face strict liability, which does not depend on proof of negligence. BLACK'S, *supra*, at 1099.

indemnification agreement pursuant to RCW 4.24.115, the general contractor would pay for any fault of the subcontractor, a result wholly inconsistent with our prior case law.

*Moen*, 128 Wn.2d at 761. Thus, we have clearly approved of the contractual concessions that Inland Washington fears would undermine workers' compensation. Inland Washington does not argue that *Moen* is incorrect or harmful.

In sum, we reverse the trial court and hold that Inland Washington faces potential vicarious liability for the negligence, if any, of Hilltop, Ralph's, and Miles. The trial court previously denied both Ralph's and Miles's motion for summary judgment and stayed proceedings pending this appeal. Since the Vargas family has live claims against Ralph's and Miles, we remand for further proceedings consistent with this opinion.

## CONCLUSION

Our prior decisions have clearly held that general contractors have expansive duties to ensure worker safety. In this case, genuine issues of material fact remain as to whether Inland Washington is directly liable for Vargas's injury—that is, whether Inland Washington breached its common law and statutory duties to provide a safe workplace and whether any breach proximately caused the injury. Inland Washington is also potentially vicariously liable for the negligence, if any, of Hilltop, Ralph's, and Miles. We therefore reverse and remand this case to the trial

court, where the currently stayed proceedings may resume with Inland Washington as a party.

Geof McCld, J.

WE CONCUR:

Fairhurst, CJ.

Stephens, J.

Johnson, J.

Wiggins, J.

Madsen, J.

González, J.

Owens, J.

Yu, J.