**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| MARCI PETERHANS, individually and AS GUARDIAN FOR COLIN PETERHANS, | No. 86838-1-I |
| Appellant, | DIVISION ONE |
| v. | PUBLISHED OPINION |
| UNIVERSITY OF WASHINGTON, a Washington State Agency, and THE STATE OF WASHINGTON, | |
| Respondent. | |

FELDMAN, J. — Marci Peterhans, individually and as Colin Peterhans' guardian, alleges that Colin was negligently discharged from Harborview Medical Center's psychiatric department following involuntary treatment under the Involuntary Treatment Act (ITA), RCW 71.05, which requires proof of bad faith or gross negligence.[1] Finding insufficient evidence to establish such a claim, the trial court dismissed it on summary judgment. Peterhans appeals that ruling as well as the trial court's earlier ruling granting reconsideration of an order dismissing Peterhans' complaint under CR 41(a). We affirm.

---

[1] Because this matter involves both Colin and Marci Peterhans, we refer to Colin by his first name to avoid confusion. And, given her role as plaintiff, we refer to Marci Peterhans as "Peterhans." Also, as used herein, "Defendants" refers to the University of Washington and the State of Washington as set forth in Peterhans' complaint and discussed in section I of this opinion.

I

Because the principal issue in this appeal is whether the trial court erred in granting Defendants' motion for summary judgment, the facts herein are set forth in the light most favorable to Peterhans, the non-moving party, based on the evidence submitted on summary judgment. *Harper v. State*, 192 Wn.2d 328, 340, 429 P.3d 1071 (2018).

On August 12, 2020, Colin was admitted to Harborview for involuntary treatment under the ITA after overdosing on lithium medication. Colin has an "extensive psychiatric history," which includes a history of suicide attempts. At the time he was admitted, Colin had a number of risk factors for suicide, including his "psychiatric diagnoses, psychotic symptoms, history of substance use, recent psych hospitalizations within the past year, and recent suicide attempt." Six weeks later, on September 26, Colin "seriously assaulted" a Harborview staff member and was placed in seclusion. He remained in seclusion following this event as he was unable to say he would not assault again. Around this same time, Colin also engaged in self-harm—he cut his hand—and refused treatment.

Harborview psychiatrist Dr. Sharon Romm discharged Colin from Harborview on September 28. According to the discharge summary, "[i]t was believed that he wasn't benefitting from hospitalization so discharge was planned." The discharge summary also indicates Colin "denied [suicidal ideation] at time of discharge." When Peterhans learned Colin would be discharged, she contacted Dr. Romm and asked her "to keep Colin there at Harborview until [she] could get a plane and fly back to be there for him." Peterhans testified she "spoke to two

providers that day, one of whom told [her] something to the effect that 'they would no longer be Colin's babysitter.'"

Colin left Harborview at approximately 4 p.m. He was given one week of medication (so limited due to previous overdose attempts) and agreed to continue taking the medication following discharge. A taxi transported Colin to his apartment, where he discovered that someone had stolen his belongings. Following that discovery, Colin jumped from his fifth-floor apartment window. He arrived at Harborview's emergency department just after midnight on September 29, having suffered a permanent brain injury leaving him in a coma-like state.

In April 2023, Peterhans, individually and as guardian for Colin, sued the University of Washington and the State of Washington, asserting that Dr. Romm—their employee at Harborview—caused Colin's injuries by negligently discharging him from Harborview's psychiatric facility. Although Defendants filed an answer largely denying Peterhans' allegations, they do not dispute, as Peterhans' complaint alleges, that the University manages the hospital and that employees of Harborview, including Dr. Romm, are State employees.

On May 3, 2024, Defendants filed a motion for summary judgment arguing that Peterhans could not establish liability. The trial court heard oral argument on the motion on May 31, 2024. At the conclusion of the hearing, the court informed the parties it intended to issue a written ruling later that day. Shortly after the hearing, Peterhans' counsel e-mailed the court and Defendants' counsel indicating Peterhans would immediately seek voluntary dismissal under CR 41. Approximately 20 minutes later, Peterhans submitted a formal motion for voluntary

dismissal, and the trial court promptly entered an order dismissing the case without prejudice.

The next court day, June 3, Peterhans refiled her complaint, which was assigned to a different judge. Defendants then filed a motion for reconsideration of the previous dismissal order, arguing Peterhans could not voluntarily dismiss the case after it had been submitted to the court for a decision on summary judgment. The court granted the motion for reconsideration and vacated the voluntary dismissal order. The court then turned again to Defendants' summary judgment motion and granted it. Peterhans appeals.

II

A

Peterhans argues the trial court erred when it granted Defendants' motion for reconsideration regarding the court's previous dismissal order. We disagree.

CR 41(a) addresses "voluntary dismissal" and distinguishes between "mandatory" and "permissive" dismissal. Only mandatory dismissal is relevant here. Addressing that issue, CR 41(a)(1)(B) provides in relevant part, "any action shall be dismissed by the court . . . [u]pon motion of the plaintiff at any time before plaintiff rests at the conclusion of plaintiff's opening case." The trial court's application of CR 41(a)(1)(B) is a question of law, which we review de novo. *League of Women Voters of Wash. v. King County Records, Elections & Licensing Servs. Div.*, 133 Wn. App. 374, 378, 135 P.3d 985 (2006) ("Where we are required to review the application of a court rule to the facts . . . our review is . . . de novo.").

In the context of a summary judgment proceeding, a plaintiff has a right to voluntary dismissal until the summary judgment motion has been submitted to the

4

court for determination. *Paulson v. Wahl*, 10 Wn. App. 53, 57, 516 P.2d 514 (1973). Where a motion for voluntary dismissal has been filed before the hearing on summary judgment has begun, the motion must be granted as a matter of right. *Greenlaw v. Renn*, 64 Wn. App. 499, 503, 824 P.2d 1263 (1992). But once the trial court has announced its oral decision, a plaintiff has no right to voluntary dismissal. *Beritich v. Starlet Corp.*, 69 Wn.2d 454, 458-59, 418 P.2d 762 (1966).

The facts of this case lie between those in *Greenlaw* and *Beritich*. The summary judgment hearing had begun and the parties had concluded their oral arguments, but the trial court had not yet announced its decision. We hold that, under these circumstances, the motion for summary judgment had been submitted to the court for determination for purposes of applying the above legal principles, notwithstanding the fact that the court had not yet rendered a decision. Absent such a rule, claimants could unilaterally dismiss an action whenever the court expresses skepticism regarding the party's claims at a summary judgment hearing, which would allow improper judge shopping and waste both private and judicial resources. Applying this rule here, Peterhans was not entitled to voluntary dismissal under CR 41(a)(1)(B).

Nor did Defendants waive this argument, as Peterhans claims, by failing to object to Peterhans' dismissal motion during the short interval between the time Peterhans filed the motion and the time the trial court granted it. "[T]he purpose of the error preservation requirement is to allow the trial court an opportunity to correct the error by bringing it to the court's attention." *Salas v. Hi-Tech Erectors*, 168 Wn.2d 664, 671 n.2, 230 P.3d 583 (2010). Here, Defendants appropriately brought the asserted error to the trial court's attention by filing a timely motion for

reconsideration of the previous dismissal order, thereby allowing the trial court to correct the asserted error, which it did. Peterhans' waiver argument therefore fails.

B

Peterhans next argues the trial court erred when it granted Defendants' motion for summary judgment dismissing her claims. We again disagree.

Because Colin received treatment under the ITA, Peterhans cannot hold Defendants liable for professional negligence in the same way she could in an ordinary medical setting. Addressing that issue, the ITA states:

> No officer of a public or private agency, nor the superintendent, professional person in charge, his or her professional designee, or attending staff of any such agency . . . designated crisis responder, nor the state . . . shall be civilly or criminally liable for performing duties pursuant to this chapter with regard to the decision of whether to admit, discharge, release, administer antipsychotic medications, or detain a person for evaluation and treatment: PROVIDED, *That such duties were performed in good faith and without gross negligence*.

RCW 71.05.120(1) (emphasis added). Thus, Defendants cannot be liable under the ITA for Dr. Romm's discharge decision unless Peterhans establishes *either* gross negligence *or* bad faith.

Starting with bad faith, Peterhans failed to meaningfully address this issue in response to Defendants' summary judgment motion. As the trial court correctly concluded: "No evidence whatsoever has been provided to show action in bad faith." The court then added,

> The Court cannot take counsel's argument as an established fact, despite the framing as a "circumstantial" fact. It is pure argument the patient discharge was somehow motivated by some sort of retribution due to an incident a few days before discharge, when Mr. Peterhans pushed a staff member. No witness even suggests this to be true.

The record supports that determination. We therefore focus, as did the trial court below, on Peterhans' attempt to establish gross negligence.

Our Supreme Court summarized Washington law regarding proof of "gross negligence" in *Harper*. Citing its earlier opinion in *Nist v. Tudor*, 67 Wn.2d 322, 407 P.2d 798 (1965), the court explained:

> In *Nist*, the foundational case on the issue, we expanded on the "frequently expressed statement that gross negligence means the failure to exercise slight care." 67 Wash.2d at 324, 407 P.2d 798 (citing *Crowley v. Barto*, 59 Wash.2d 280, 367 P.2d 828 (1962); *Eichner v. Dorsten*, 59 Wash.2d 728, 370 P.2d 592 (1962)). In doing so, we described "gross negligence" as "negligence substantially and appreciably greater than ordinary negligence." *Id*. at 331, 407 P.2d 798. The failure to exercise slight care, we continued, does not mean "the total absence of care but care substantially or appreciably less than the quantum of care inhering in ordinary negligence." *Id*.

*Harper*, 192 Wn.2d at 342. Summarizing these various legal standards, the court stated: "To survive summary judgment in a gross negligence case, a plaintiff must provide substantial evidence of *serious negligence*." *Id.* at 345-46 (emphasis added).[2]

Applying these definitions, the court in *Harper* explained that the first step when analyzing a claim of gross negligence on a motion for summary judgment is to "specifically identify the relevant failure alleged by the plaintiff." *Id.* at 343. The second step is to "determine whether the plaintiff presented substantial evidence that the defendant failed to exercise slight care under the circumstances

---

[2] In this respect, *Harper* is consistent with the Third Restatement of Torts, which succinctly states that gross negligence "simply means negligence that is especially bad." RESTATEMENT (THIRD) OF TORTS § 2 (AM. LAW INST. 2010). In *Swank v. Valley Christian School*, 188 Wn.2d 663, 398 P.3d 1108 (2017), our Supreme Court similarly explained, "Stated more fully, [gross negligence] is the 'failure to exercise slight care, *mean[ing] not the total absence of care but care substantially or appreciably less than the quantum of care inhering in ordinary negligence.*'" *Id.* at 684 (emphasis added) (quoting *Nist*, 67 Wn.2d at 331). Thus, the "absence of slight care" formulation is ultimately encompassed within the "serious negligence" standard.

7

presented, considering both the relevant failure and, if applicable, any relevant actions that the defendant did take." *Id.* Importantly, *Harper* also states, "Although breach is generally a question left for the trier of fact, the court may determine the issue as a matter of law 'if reasonable minds could not differ.'" *Id.* at 341 (quoting *Hertog v. City of Seattle*, 138 Wn.2d 265, 275, 979 P.2d 400 (1999)). We review the trial court's decision regarding this issue de novo and, like the trial court, "we consider 'facts and reasonable inferences from the facts . . . in the light most favorable to the nonmoving party.'" *Id.* at 340 (quoting *Hertog*, 138 Wn.2d at 275).

The trial court's summary judgment ruling does not comprehensively state the applicable legal standard as set forth in *Harper*. It instead focuses solely on the slight care standard as follows:

> [T]o prevail on this motion, Plaintiff must show that Dr. Romm's behavior showed a lack of even slight care.
>
> . . . .
>
> [T]he Court finds that reasonable minds could not differ about the fact that UW Defendants certainly exercised at least slight care, which is all that is necessary to overcome an allegation of gross negligence in a motion for summary judgment . . . . [T]he demonstration of slight care is all that is required to maintain that immunity [under the ITA].

At no point did the trial court acknowledge that "[t]he failure to exercise slight care," as our Supreme Court "expanded on" in *Nist*, "does not mean 'the total absence of care but care substantially or appreciably less than the quantum of care inhering in ordinary negligence.'" *Harper*, 192 Wn.2d at 342 (quoting *Nist*, 67 Wn.2d at 331). Nor did the trial court acknowledge or apply the *Harper* court's holding, "To survive summary judgment in a gross negligence case, a plaintiff must provide substantial evidence of serious negligence." *Id.* at 345-46. Without a more precise

8

statement of the applicable legal standard, we cannot determine whether the trial court improperly curtailed its analysis.

Regardless, we may affirm on any grounds supported by the record,[3] and we do so here. At bottom, the fatal flaw in Peterhans' response to Defendants' summary judgment motion is that it is not adequately supported by expert testimony. Because Peterhans alleges medical negligence, establishing whether reasonable minds could differ with regard to gross negligence requires expert testimony stating the applicable standard of care, explaining how the care given to Colin fell substantially short of that standard, and establishing causation. *Hill v. Sacred Heart Med. Ctr.*, 143 Wn. App. 438, 446, 448, 177 P.3d 1152 (2008). Critical here, "The expert's opinion must be based on fact and cannot simply be a conclusion or based on an assumption if it is to survive summary judgment." *Volk v. DeMeerleer*, 187 Wn.2d 241, 277, 386 P.3d 254 (2016).

*Reyes v. Yakima Health District*, 191 Wn.2d 79, 87, 419 P.3d 819 (2018), draws "[a] useful contrast . . . between two similar cases to demonstrate what is required for a medical expert's testimony to create a genuine issue." It begins with *Keck v. Collins*, 184 Wn.2d 358, 357 P.3d 1080 (2015), where the plaintiff's expert testified as follows:

> "The surgeons performed multiple operations without really addressing the problem of non-union and infection within the standard of care. ...
>
> ...With regards to referring Ms. Keck for follow up care, the records establish that the surgeons were sending Ms. Keck to a general dentist as opposed to an oral surgeon or even a plastic surgeon or

---

[3] *In the Matter of Gilbert Miller Testamentary Credit Shelter Tr. & Estate of Miller*, 13 Wn. App. 2d 99, 107, 462 P.3d 878 (2020) (citing *Blue Diamond Grp., Inc. v. KB Seattle 1, Inc.*, 163 Wn. App 449, 453, 266 P.3d 881 (2011)).

an Ear, Nose and Throat doctor. Again, this did not meet the standard of care as the general dentist would not have had sufficient training or knowledge to deal with Ms. Keck's non-union and the developing infection/osteomyelitis."

*Reyes*, 191 Wn.2d at 87 (quoting *Keck*, 184 Wn.2d at 371). Based on that testimony, the Supreme Court held "a jury could conclude that a reasonable doctor would have referred Keck to another qualified doctor for treatment—standard of care—and that the Doctors did not treat her issues or make an appropriate referral—breach." *Keck*, 184 Wn.2d at 372.

Next, the court in *Reyes* discusses *Guile v. Ballard Community Hospital*, 70 Wn. App. 18, 851 P.2d 689 (1993), where the plaintiff's expert testified:

> "Mrs. Guile suffered an unusual amount of post-operative pain, developed a painful perineal abscess, and was then unable to engage in coitus because her vagina was closed too tight. All of this was caused by faulty technique on the part of the first surgeon, Dr. Crealock. In my opinion he failed to exercise that degree of care, skill, and learning expected of a reasonably prudent surgeon at that time in the State of Washington, acting in the same or similar circumstances."

*Reyes*, 191 Wn.2d at 87 (quoting *Guile*, 70 Wn. App.at 26). Unlike the expert testimony in *Keck*, the testimony in *Guile* was determined to be "insufficient" because it was "merely a summarization of Guile's postsurgical complications, coupled with the unsupported conclusion that the complications were caused by Crealock's 'faulty technique.'" *Guile*, 70 Wn. App.at 26.

Having described these two comparators, the court in *Reyes* turned to the expert testimony at issue in the appeal. The expert there submitted two affidavits. In the first affidavit, the expert testified:

> (a) Jose Reyes did not have tuberculosis when he presented at Yakima Health District and Dr. Spitters, stated with reasonable medical certainty;

(b) Jose Reyes did suffer from chronic liver disease, and was at risk for catastrophic liver failure if he were treated with medicines contraindicated for liver disease, stated with reasonable medical certainty;

(c) Jose Reyes presented to Yakima Health District and Dr. Spitters with clinical symptoms of liver failure that should have been easily diagnosed by observation of the patient, stated with reasonable medical certainty;

(d) The failure of Yakima Health District and Dr. Spitters to accurately diagnose Jose Reyes' liver disease and liver deterioration due to prescribed medications to treat tuberculosis that were contraindicated for Jose Reyes were direct and proximate causes of Mr. Reyes' liver failure and death, stated with reasonable medical certainty.

191 Wn.2d at 88. And in a second affidavit, the expert stated: "[a]n alternate drug should have been introduced for Mr. Reyes if the defendants chose to treat Mr. Reyes empirically for tuberculosis." *Id.*

Comparing this expert testimony to that in *Keck* and *Guile*, the court held it was insufficient to create a genuine issue of material fact. The court summarized its holding as follows:

> There is no indication of what a reasonable physician should have done other than diagnose liver failure by observation of the patient. This circular conclusion is akin to the deficient expert witness testimony in *Guile*, where an allegation that a reasonable doctor would not have acted negligently was found insufficient to create a genuine issue of material fact. 70 Wash.App. at 26, 851 P.2d 689.

> Nor can negligence be inferred from the factual allegations relating to Mr. Reyes' tragic death. *See Watson v. Hockett*, 107 Wash.2d 158, 161, 727 P.2d 669 (1986) ("[A] doctor will not normally be held liable under a fault based system simply because the patient suffered a bad result."). Allegations amounting to an assertion that the standard of care was to correctly diagnose or treat the patient are insufficient. Instead, the affiant must state specific facts showing what the applicable standard of care was and how the defendant violated it. Dr. Martinez failed to do so.

11

191 Wn.2d at 89. Lastly, the court added, "In affirming the court of appeals, we do not require affiants to aver talismanic magic words, but allegations must amount to more than conclusions of misdiagnosis, with a basis in admissible evidence that can support a claim." *Id.* (citing *Keck*, 184 Wn.2d at 370).

Here, in response to Defendants' summary judgment motion, Peterhans relied on the testimony of William Newman, M.D., a board certified psychiatrist who testified he is familiar with "[t]he standard of care for reasonably prudent inpatient treatment and discharge decisions pertaining to patients in danger of harming themselves." In his initial declaration, Dr. Newman testified as follows:

4. I have reviewed substantial records pertaining to Colin's stay at the Defendant Harborview's Psychiatric floor in August and September of 2020.

5. Colin was discharged from the floor on September 28th, 2020. A matter of hours later he attempted suicide by jumping out his apartment window, sustaining catastrophic injuries.

6. This suicide attempt was clearly foreseeable under the circumstances and clearly preventable by not discharging him at that time. Further, as amply documented in Defendant's own chart, the decision to discharge him fell significantly below the standard of care for reasonably prudent psychiatrists under the circumstances, in the state of Washington or any other state.

7. Colin was admitted to the Defendant's psychiatric ward in the first place on August 12th, 2020 following an apparent suicide attempt, i.e., an overdose of lithium. His extensive psychiatric history was significant for past episodes of self-harm, including another recent overdose of lithium and a cut on his neck with a knife. Upon admission he was "frankly psychotic." He made little if any discernable progress.

8. At one point during the stay he harmed himself with a cut to his hand, and refused a wound consult that had been offered him.

9. Two days before discharge, he "seriously assaulted" a male staff member and was placed in seclusion. The discharge summary clearly states that "it was believed that he wasn't benefiting

from hospitalization" and discharge was therefore planned. In fact, with a longstanding diagnosis of a Psychotic Disorder, Colin was the exact type of patient who would be likely to benefit from inpatient psychiatric treatment. The standard of care was to keep him involuntarily committed until he was stable for discharge, i.e., clearly not a danger to himself or others.

10. Up to literally the day before discharge, Colin's Attending Physicians continuously certified in his records that he "may not be released from involuntary commitment to accept treatment on a voluntary basis, or to be discharged from the hospital to accept voluntary outpatient treatment upon referral."

11. Indeed, three days before discharge, Dr. Sharon Romm had certified that he "may not be released from involuntary commitment to accept treatment on a voluntary basis." Yet, three days later----after his assault on the staff member----Dr. Romm personally saw to his discharge.

12. In fact, records indicate that Dr. Romm was "concerned about the patient's risk of OD (overdose)" even as he was discharged, and therefore had authorized only a one-week supply of medications as he left.

13. It's well known that psychiatric patients such as Colin are at increased risk of suicide immediately following discharge from an inpatient facility. Colin was discharged into his own care, though his mother was in contact with the facility, and though out of town, was asking them to at least delay discharge until she could be there to see to Colin. Even had discharge been appropriate, which it wasn't, discharging Colin into his own care was an additional breach of the standard of care.

14. The above is an overview of my opinions, namely (1) Colin's discharge was below the standard of care for reasonably prudent inpatient psychiatrists in the situation presented, at the relevant time in the State of Washington and (2) keeping him hospitalized and under reasonably prudent care would have prevented his suicide attempt immediately following discharge.

Then, in a supplemental declaration, Dr. Newman cited the pattern jury instruction regarding gross negligence and opined: "In my opinion, to a reasonable degree of

13

medical certainty, the decision to discharge Colin at all, let alone to his own care was 'gross negligence' as defined by the Washington pattern jury instruction."[4]

Applying the above legal principles regarding the meaning of "gross negligence" and the sufficiency of expert testimony in cases alleging medical negligence to Dr. Newman's declarations, there are at least two overarching flaws in his testimony. First, similar to the expert testimony in *Reyes* and *Guile*, there is no indication what a reasonable physician should have done other than delay Colin's discharge. As the court observed in *Reyes*, this is "akin to the deficient expert witness testimony in *Guile*, where an allegation that a reasonable doctor would not have acted negligently was found insufficient to create a genuine issue of material fact." *Reyes*, 191 Wn.2d at 89 (citing *Guile*, 70 Wn. App. at 26). This deficiency is especially troubling here because Colin was receiving involuntary treatment under the ITA, which allows the State to detain a person for evaluation and treatment only when certain statutory criteria are satisfied. Relevant here, the stated intent of the statute includes: "[t]o protect the health and safety of persons suffering from behavioral health disorders"; "[t]o prevent inappropriate, indefinite commitment of persons living with behavioral health disorders"; "[t]o safeguard individual rights"; and "[t]o encourage, whenever appropriate, that services be provided within the community" RCW 71.05.010(a), (b), (d), and (g). Dr. Newman's declaration does not address this statutory overlay. Like the expert

---

[4] The pattern jury instruction cited by Dr. Newman states: "Gross negligence is the failure to exercise slight care. It is negligence that is substantially greater than ordinary negligence. Failure to exercise slight care does not mean the total absence of care but care substantially less than ordinary care." 6 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 10.07 (6th ed. 2012). While the instruction begins with the "slight care" formulation, it defines that legal standard by comparing it to ordinary care, which, as discussed in the text above, is consistent with controlling case law.

testimony in *Reyes* and *Guile*, Dr. Newman's bald assertion that a reasonable doctor would not have discharged Colin when and as Defendants did is insufficient to create a genuine issue of material fact on summary judgment.

Second, notwithstanding the court's holding in *Harper* that the applicable analysis encompasses "both the relevant failure and, if applicable, any relevant actions that the defendant did take," 192 Wn.2d at 343, Dr. Newman does not address the actions Defendants *did* take leading to discharge. The summary judgment record shows that Dr. Romm and others at Harborview regularly monitored Peterhans for suicide risk with multiple providers documenting that his risk was low in the days just prior to discharge, that Dr. Romm evaluated Colin's treatment history and assessed his condition before discharge, and that Colin was discharged under an outpatient care plan which included Colin's agreement to take his medications. Dr. Newman does not address these actions. Nor does he explain how Defendants' failure to take certain actions—short of simply denying discharge—caused Colin's injuries. Dr. Newman thus fails to fully engage in the required analysis under *Harper*.

While Dr. Newman discusses some of the circumstantial facts associated with discharge, he again fails to engage in the required analysis. For example, Dr. Newman claims that, three days prior to discharge, Dr. Romm certified that Colin "may not be released from involuntary commitment to accept treatment on a voluntary basis" and then questions how that could no longer be true on the day of discharge. This merely shows that Colin was not ready for discharge until Dr. Romm and others reevaluated their prior determination—which clearly had to occur at some point—and concluded they could no longer lawfully detain Colin for

15

involuntary treatment. Dr. Newman does not explain how this iterative certification process fell substantially short of the applicable standard of care. Dr. Newman also states that Colin's mother was or would soon be en route to Harborview and then opines, "Even had discharge been appropriate, which it wasn't, discharging Colin into his own care was an additional breach of the standard of care." But there is no testimony substantiating this purported standard of care, which, broadly applied, would require continuing to detain patients for involuntary treatment until a family member arrived for discharge. The ITA contains no such proviso.

On this record, the trial court did not err in granting summary judgment dismissing Peterhans' cause of action for gross negligence. We affirm.

_____
Feldman, J.

WE CONCUR:

_____          _____
Birk, J.                                          Coburn, J.